1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTURO GONZALEZ on behalf of himself, all others similarly situated, and on behalf of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>NCI GROUP, INC., dba NCI BUILDING SYSTEMS; and DOES 1-100,<br><br>Defendants. | Case No.: 1:18-cv-00948-AWI-SKO<br><br>**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>(Doc. No. 18) |

Plaintiff Arturo Gonzalez ("Gonzalez" or "Plaintiff") brought this putative class action against NCI Group, Inc. ("NCI") alleging various claims stemming from missed or abbreviated rest and meal breaks.[1] The Parties reached a settlement prior to class certification. Plaintiff now brings an unopposed motion for conditional certification of the proposed class (the "Class") under Rule 23 of the Federal Rules of Civil Procedure and preliminary approval of the settlement.

For the reasons set forth below, Gonzalez's motion will be denied without prejudice.

## I.   BACKGROUND

NCI manufactures and markets metal building systems and components for the nonresidential construction industry. Doc. No. 17 ¶ 38. Gonzalez was employed by NCI at times relevant to this action as a non-exempt, hourly shipping checker in California. Id. ¶ 26.

Gonzalez filed this putative class action in Merced County Superior Court on June 6, 2018,

---

[1] Plaintiff and Defendant are referred to collectively herein as the "Parties."

1   on behalf of himself and others similarly situated, including warehouse workers, industrial

2   workers, shipping clerks and other categories of non-exempt, hourly workers in NCI's employ in

3   California during the four-year period prior to the filing of this action. Doc. No. 1 ¶¶ 2, 4. NCI

4   answered the Complaint on July 11, 2018, id., Ex. B, and removed the case to this Court on

5   diversity grounds under the Class Action Fairness Act ("CAFA") on July 12, 2018. Id. A First

6   Amended Complaint ("1AC") was filed on February 3, 2020. Doc. No. 17.

7         The 1AC alleges eight causes of action under the California Labor Code, California's

8   Unfair Competition Law and the Industrial Welfare Commission's ("IWC") California Wage

9   Orders based primarily on allegations that NCI had a policy and/or practice of failing to pay non-

10  exempt hourly employees for missed break time. Doc. No. 17. For example, Plaintiff contends that

11  NCI failed to provide proper compensation for time spent walking to and from break areas and

12  time spent doffing and donning protective gear prior to and following breaks, in addition to failing

13  to provide proper compensation for breaks that were missed completely. See Doc. No. 18, page 18

14  of 32, lines 23 through 28.

15        The 1AC defines the putative class ("Class") as "[a]ll persons who are employed or have

16  been employed by [NCI] in the State of California as hourly, [non-exempt] employees during the

17  period of the relevant statute of limitations." Doc. No. 17 ¶ 44. Further, the 1AC alleges subclasses

18  defined as all persons within the Class who worked: (i) one or more shifts in excess of five hours;

19  (ii) one or more shifts in excess of six hours; (iii) one or more shifts in excess of 10 hours; (iv) one

20  or more shifts in excess of 12 hours; (v) one or more shifts in excess of two hours; (vi) one or

21  more shifts in excess of three and one-half hours, but less than or equal to six hours; and (vii) one

22  or more shifts in excess of six hours, but less than or equal to 10 hours. Id.

23        According to the 1AC, Gonzalez also seeks to represent subclasses comprising all persons

24  within the Class who: (i) "separated their employment from [NCI]"; (ii) worked one or more shifts

25  in which they received a wage statement for the corresponding pay period; or (iii) had wages

26  deducted for meal periods. Doc. No. 17 ¶ 44.

27        The Parties entered into a settlement stipulation (the "Settlement Agreement") following

28  mediation that took place on November 19, 2019 with a retired Superior Court judge. Doc. No. 19,

Ex. A; see Doc. No. 18, page 11 of 32, lines 11 through 14. Gonzalez now brings an unopposed motion for an Order: (i) granting provisional certification of the Class for settlement purposes; (ii) preliminarily approving the proposed settlement; (iii) approving notice to the Class ("Class Notice") and the plan for distribution of Class Notice; (iv) appointing an administrator for the settlement ("Settlement Administrator"); and (v) setting a final approval hearing. Doc. No. 18, page 2 of 32.

## II.    PROPOSED SETTLEMENT

### A.    Class

The Settlement Agreement seeks to settle this action on behalf of a single class defined as "all non-exempt current and former employees who worked for [NCI] as hourly warehouse workers, industrial workers, shipping checkers, distribution employees, shipping clerks, packers, slackers, loaders, packaging clerks, machine operators, receiving clerks, production workers, and all other similarly situated employees in California at any time during the Class Period." Doc. No. 19 § 1.1.[2] The Class Period is defined as the period from June 6, 2014 through February 24, 2020, id. §1.5, and the parties agree that the Class will comprise approximately 274 current and former NCI employees ("Class Members" or, individually, "Class Member"). Id. § 1.1.

### B.    Terms of Settlement Agreement

NCI will pay a "Maximum Settlement Amount" ("MSA")—defined as "the maximum total that can be paid by [NCI]" pursuant to the Settlement Agreement—of $600,000 (or approximately $2,190 per Class Member). Doc. No.19 § 1.19. The MSA will cover: (i) settlement payments to Class Members who do not opt out of the settlement ("Settlement Class Members"); (ii) attorneys' fees in an amount not to exceed $150,000; (iii) litigation expenses in an amount not to exceed $30,000; (iv) an "enhancement payment" to Gonzalez for services rendered and risk assumed as the named plaintiff in this action in an amount not to exceed $5,000; (v) administration fees and expenses to the Settlement Administrator in an amount not to exceed $15,000; and (vi) a payment to the California Labor and Workforce Development Agency ("LWDA") and Settlement Class

---

[2] Section 1.1 appears twice in the Settlement Agreement, first on page 5 and again on page 6. The citations herein refer to Section 1.1 on page 6 of the Settlement Agreement. See Doc. No. 19, pages 8 and 9 of 48.

1  Members under the Private Attorneys General Act ("PAGA") of $60,000 ($45,000 to the LWDA

2  and $15,000 to Settlement Class Members). Id.

3        The "Net Settlement Amount" ("NSA") is the amount remaining for disbursement to

4  Settlement Class Members after subtracting from the MSA Court approved attorneys' fees and

5  costs, Gonzalez's enhancement payment, settlement administration costs, and the LWDA portion

6  of the PAGA. Doc. No. 19 § 1.20. "If the Court does not approve and/or reduces the amounts of

7  the requested attorneys' fees and costs, enhancement award, or administration fees, then the

8  amount of any such reduction will become part of the NSA." Id. The estimated NSA is $370,000,

9  for an average of approximately $1,350 per Class Member. Doc. No. 18, page 14 of 32, lines 12

10 through 15.

11       "Settlement Payment" is defined as "the gross, total amount due to an individual

12 Settlement Class Member, which shall be the product of the Work Week Value multiplied by that

13 Settlement Class Member's number of Qualifying Work Weeks." Doc. No. 19 § 1.33. "Qualifying

14 Work Week" is defined as "any calendar week, *i.e.*, seven consecutive days from Monday to

15 Sunday during the Class Period in which a Class Member worked for [NCI] at least one day in the

16 Calendar Week." Id. § 1.27. "Work Week Value" is defined as the "quotient of the NSA divided

17 by the total number of Qualifying Work Weeks for all Class Members." Id. § 1.38.

18       Since the NSA is estimated at $370,000, Doc. No. 18, page 14 of 32, lines 13 through 15,

19 and the Parties have agreed that the total number of Qualifying Work Weeks is approximately

20 34,722 weeks, Doc. No. 19 § 1.27, the Court concludes that the Work Week Value is roughly

21 $10.66 ($370,000 / 34,722). The Court understands that to mean that a Class Member who worked

22 one day a week every week of the Class Period would receive approximately $2,218 ($10.66 x 52

23 x 4) from the settlement, as would a Class Member who worked five days a week for the same

24 number of weeks, regardless of any differences in wages, overtime, the length of shifts worked or

25 the number of breaks to which the Class Members were respectively entitled.

26       Settlement Payments will be made by check. Doc. No. 19 § 2.8.3. No action on the part of

27 a Class Member is required to receive payment and checks will remain negotiable for 180 days

28 from the date of mailing. Id. § 2.8.4. The Settlement Administrator will distribute all funds

associated with any checks that are not properly or timely negotiated, along with interest accrued thereon (if any), to Legal Aid At Work, which offers legal services and training to employees on their rights, such that no portion of the MSA shall revert to Defendant. Id. § 2.8.5.; Doc. No. 18, Part III.b.

**C.     Notice**

Within seven business days after entry of an Order granting preliminary approval of the settlement, NCI will provide the Settlement Administrator with a name, contact information and data relevant to calculating the prospective Settlement Payment for each Class Member based on NCI's business records. Doc. No. 19 § 2.5.3. Within 21 days after entry of the Preliminary Approval Order, the Settlement Administrator will mail and email the Class Notice to all identified Class Members, including instructions on how to opt out of or object to the settlement, and will attempt to ascertain the correct mailing address for undeliverable mail. Id. § 2.5.5.  The Settlement Administrator will also maintain a static website containing the Settlement Agreement and other relevant documents. Id. § 2.5.2.

**D.     Released Claims**

Any Class Member who does not opt-out of the settlement will be deemed to have released all claims arising from facts alleged in Plaintiff's pleadings that accrued during the Class Period. Doc. No. 19 § 1.28. Further, the Settlement Agreement expressly includes a waiver of rights as to unknown claims under Section 1542 of the California Civil Code. Id. § 1.36.

**E.     Discovery, Mediation and Class Representation**

During the course of this litigation, the Parties engaged in class-wide factual discovery in which NCI produced hundreds of documents including employee handbooks and policy manuals, earning statements, personnel files, break logs, job descriptions and work tasks, as well as tens of thousands of lines of time records. Doc. No. 18-1 ¶ 26. The Parties also participated in a mediation on November 19, 2019 with a retired Superior Court judge, and the Settlement Agreement is based on a term sheet the Parties signed as a result of that mediation. Id. ¶ 27.

Gonzalez worked for NCI as a non-exempt, hourly shipping checker for all four years of the Class Period and purports to have been subjected to all of the wrongs alleged in the 1AC,

1  including alleged wrongs with respect to meal breaks, rest breaks, wage statements and

2  termination pay. Doc. No. 17 ¶¶ 26-34.

3      Gonzalez's counsel, which includes David Mara, Jamie Serb, and Nikki Trenner from the

4  Mara Law Firm have significant experience in wage and hour class actions and other employment

5  litigation involving violations of the California Labor Code and IWC Orders. Doc. No. 18-1 ¶¶ 3-

6  22.

7      Gonzalez estimates that NCI's maximum exposure on the eight claims set forth in the 1AC

8  would be approximately $6.5 million, including claims relating to lost break time as well as

9  PAGA penalties and penalties relating to willful misconduct, wage statement violations and

10 improper accounting for termination pay. Doc. No. 18-1 ¶¶ 35-42. Based on their assessment of

11 the strengths and weaknesses of the case, Gonzalez's counsel believe the MSA of $600,000 is a

12 fair and reasonable settlement value. Id. ¶ 44.

13      **F.      Defendant's Position**

14      NCI denies all of the allegations in the 1AC and contends that it has meritorious defenses

15 to all claims. Doc. No. 19, Part IV. For example, NCI contends that it could set forth evidence

16 showing its written policies provided for all required breaks and that there is no common policy or

17 practice of requiring employees to remain at their work stations until the beginning of a break, to

18 take their breaks in a designated location, or to be back at their work stations the minute a break

19 period expires. Doc. No. 18, page 25 of 32, lines 6 through 7. NCI apparently also has evidence

20 showing that it forbids employees from performing any off-the-clock work and instructs

21 employees to doff protective gear before a break begins and to don protective gear after

22 completing a break, as well as evidence that practices with respect to breaks vary significantly

23 among employees. Id., Part V.d. NCI has nonetheless concluded that it is desirable for the case to

24 be settled on the terms set forth in Settlement Agreement, considering the cost of defending this

25 case and the uncertainty inherent in putative employment class actions of this nature. Doc. No. 19,

26 Part IV.

27      **DISCUSSION**

28      As noted above and discussed in more detail below, the 1AC seeks certification for

6

numerous subclasses based on the length of shifts worked, as well as certification of a subclass comprising employees "who separated their employment from [NCI]" during the Class Period. Doc. No. 17 ¶ 44. Further, Gonzalez asserts that the harms and potential recovery of a Class Member depend not only on the missed breaks (which can apparently vary with the length of shifts worked[3]), but also on whether a Class Member's employment with NCI was terminated during the Class Period and whether a Class Member was employed with NCI in the year prior to the filing of this action. For example, the memorandum in support of the instant motion asserts that 122 Class Members whose employment with NCI was terminated during the Class Period and 152 Class Members who were employed with NCI in the final year of the Class Period could collectively be eligible for roughly a million dollars in recovery that is not available to other Class Members. Doc. No. 18, Parts V.c.i.3. & V.c.i.5.

In the Court's view, the Parties have not adequately accounted for variation in the work histories of Class Members as it applies to recovery and thus, the Court will decline to certify the Class for settlement purposes or grant preliminary approval of the settlement. In the interest of thoroughness and in anticipation of another motion along the lines of this one, however, a step-by-step analysis of class certification and the proposed settlement is set forth below.

## I.    Certification of the Class for Purposes of Settlement

Before certifying a class, the Court must determine whether that class meets the requirements set forth in Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 23(e)(2). Courts must pay "undiluted, even heightened, attention" to class certification requirements in a settlement context. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997); Molski v. Gleich, 318 F.3d 937, 946 (9th Cir. 2003). The parties cannot "agree to certify a class that clearly leaves any one requirement unfulfilled," and consequently a court cannot blindly rely on the fact that the parties have stipulated that a class exists for purposes of settlement. Berry v. Baca, 2005 WL 1030248, at *7 (C.D. Cal. May 2, 2005).

The Court will first determine whether subsection (a) of Rule 23 is satisfied and then turn

---

[3] Gonzalez asserts that Class Members were entitled to 10 minutes of rest time per four hours worked, a first meal break after five hours of work, and a second meal break after 10 hours of work. Doc. No. 18, Part V.c.i.1.

to the certification requirements in Rule 23(b)(3). The Court will then look at whether the proposed settlement is "fair, reasonable and adequate." Fed.R.Civ.P. 23(e)(1)(C).

### A.    Rule 23(a) Class Certification Requirements

The following four criteria "must be met to certify a class action: (1) numerosity; (2) commonality of law or fact; (3) typicality of the representative plaintiff's claims; and (4) adequacy of representation." Gripenstraw v. Blazin' Wings, Inc., 2013 WL 6798926, at *3 (E.D. Cal. Dec. 20, 2013); Fed.R.Civ.P. 23(a). A class may only be certified if the court is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982). The burden is on the party seeking class certification to show that these elements have been met. Doninger v. Pac. N.W. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977).

#### 1.    Numerosity

To satisfy the numerosity requirement in Rule 23(a), a class must be so numerous that joinder of all members individually is "impracticable." Fed.R.Civ.P. 23(a)(1). This requirement "does not mean that joinder must be impossible, but rather means only that the court must find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable." In re Itel Sec. Litig., 89 F.R.D. 104, 112 (N.D. Cal. 1981) (citing Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-914 (9th Cir. 1964)). There is no specific numerical threshold; instead, the law "requires examination of the specific facts of each case and imposes no absolute limitations." General Tel. Co. v. E.E.O.C., 446 U.S. 318, 330 (1980). Generally, forty or more members will satisfy the numerosity requirement. Collins v. Cargill Mean Solutions Corp., 274 F.R.D. 294, 300 (E.D. Cal. 2011); Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

Here, the Parties agree that there are approximately 274 Class Members. Doc. No. 19 § 1.1. Joinder of such a large number of plaintiffs would be impracticable, and the Court therefore finds that numerosity is satisfied as to the Class.

#### 2.    Commonality

Questions of law or fact must be "common to the class." Fed.R.Civ.P. 23(a)(2). This does

not mean all questions of fact and law need be common. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). Instead, a plaintiff need only demonstrate "the class members have suffered the same injury ...." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-350 (2011). "Their claims must depend upon a common contention" that, when determined, would resolve an issue "central to the validity of each one of the claims in one stroke." Id. at 350. In an employment context, this inquiry is satisfied when the entire class was injured by the same system-wide policy or practice. See Goodwin v. Winn Management Group LLC, 2017 WL 3173006, at * 5 (E.D. Cal. July 26, 2017) (citation omitted); Arredondo v. Delano Farms Co., 301 F.R.D. 493, 513 (E.D. Cal. 2014); Vedachalam v. Tata Consultancy Servs., Ltd., 2012 WL 1110004, at *12–*13, (N.D. Cal. April 2, 2012); In re Taco Bell Wage & Hour Actions, 2012 WL 5932833, at *6 (E.D. Cal. Nov. 27, 2012); see also, Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001) (finding that commonality exists "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members").

As to all putative Class Members, the claims in this case are based, in large part, on the contention that NCI had company-wide policies and practices in effect during the Class Period that unlawfully deprived Class Members of break time and related compensation. That contention raises questions of fact and law involving the nature, implementation and impact of NCI's policies with respect to breaks, as well as the calculation, reporting and payment of related compensation, that satisfy the commonality requirement.

                    *3.    Typicality*

The requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality requires that a class representative "possess the same interest and suffer the same injury" as the putative class. Falcon, 457 U.S. at 156. Representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020. The typicality requirement ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Falcon, 457 U.S. at 157, n.13.

1    Gonzalez alleges that he was employed by NCI as a non-exempt, hourly shipping checker

2    for the entirety of the Class Period—including the year prior to the commencement of this

3    action—and that as such he was subject to the policies and practices with respect to breaks and

4    compensation at issue here. Doc. No. 17 ¶¶ 5-22. He further alleges that he was terminated, such

5    that he was harmed by NCI's policies and practices with respect to the calculation and payment of

6    wages both during the term of his employment and at the time of termination. Id. ¶ 20. In other

7    words, Gonzalez alleges that he personally suffered all of the harms alleged in the 1AC. His

8    claims are co-extensive with those of the Class and typicality is satisfied.

9            *4.    Adequacy*

10   The requirement of adequate representation asks whether the representative "will fairly and

11   adequately protect the interests of the class." See Fed.R.Civ.P. 23(a)(4). Courts are to inquire (i)

12   whether the named plaintiff and counsel have any conflicts of interest with the rest of the potential

13   class members and (ii) whether the named plaintiff and counsel will prosecute the action

14   vigorously for the class as a whole. See Hanlon, 150 F.3d at 1020.

15   As discussed at greater length in the analysis of the reasonableness and fairness of the

16   settlement below, the Settlement Agreement does not take account of differences among Class

17   Members with respect to wage levels, shift lengths or the number of shifts worked per week. For

18   example, it appears that a relatively junior Class Member employed at an entry-level wage who

19   worked one four-hour shift per week for the entire Class Period would stand to recover just as

20   much under the Settlement Agreement as a senior Class Member who worked five 10-hour shifts

21   per week for the entire Class Period at a higher wage, even though the latter Class Member would

22   presumably have been deprived of significantly more break time and pay under Gonzalez's theory

23   of the case. Thus, Gonzalez and his counsel could have a conflict with the Class to the extent other

24   Class Members worked a larger number of longer shifts at higher wages.

25   The Court's concern in this respect is mitigated somewhat by the fact that Gonzalez's

26   proposed enhancement fee of $5,000 is more than twice the amount of the largest Settlement

27

28

payment Gonzalez could receive under the Settlement Agreement ($2,217, it appears[4]), thus reducing the incentive to game the calculation of Settlement Payments, as well as the fact that the maximum recovery available under the Settlement Agreement is relatively modest and the fact that the 1AC alleges that Gonzalez suffered all of the harms at issue in this action, including harms associated with longer shifts and even termination. Further, it may well be that there is uniformity in the number and length of shifts worked by Class Members and in the wages that Class Members were paid. Such assumptions, however, are at odds with common sense and in tension with the fact that the 1AC alleges multiple subclasses based on shift lengths ranging from two hours to 12 hours.[5] Doc. No. 17. The Court therefore needs more information as to how Gonzalez's work history compares to the work histories of other Class Members to resolve its concern about potential conflicts and to get comfort that Gonzalez and his counsel (however capable) adequately represent the interests of all Class Members.

### 5. Summary of Rule 23(a) Analysis

For the foregoing reasons, the Court finds that numerosity, typicality and commonality are satisfied for purposes of the Rule 23(a) analysis of the settlement, but that more information is required to determine whether Gonzalez and his counsel are adequate representatives of the proposed Class as a whole.

### B. Rule 23(b) Class Certification Requirements

In addition to satisfying Rule 23(a), a putative class must fulfill one of the requirements of Rule 23(b) for a court to grant certification. Amchem, 521 U.S. at 614. Plaintiff seeks certification under Rule 23(b)(3), Doc. No. 18, Part IV.b, which requires a showing that: (1) questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. See Amchem, 521 U.S. at 615. The test of Rule 23(b)(3) is "far more

---

[4] 4 years x 52 weeks per year x $10.66 (Work Week Value) = $2,217.28.

[5] Plaintiff does not seek certification of these subclasses in his motion and the Court takes no position here on whether certification of these subclasses is required for purposes of settlement or otherwise. The Court's concern, for purposes of the instant motion and, more specifically, this Rule 23(a) analysis, is that the numerous subclasses alleged in the 1AC indicate possible variability in the work histories of Class Members that has not been given adequate consideration in structuring the settlement.

1   demanding" than that of Rule 23(a). <u>Wolin v. Jaguar Land Rover N. Am., LLC</u>, 617 F.3d 1168,

2   1172 (9th Cir. 2010).

3            *1.    Predominance*

4            Common questions of law and fact predominate over individual questions, satisfying the

5   first component of the Rule 23(b)(3) inquiry, where "the issues in the class action subject to

6   generalized proof, and thus applicable to the class as a whole ... predominate over those issues that

7   are subject only to individualized proof." <u>Ortega v. J.B. Hunt Transport, Inc.</u>, 258 F.R.D. 361, 366

8   (C.D. Cal. 2009) (citing <u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 280 F.3d 124, 136 (2nd Cir.

9   2001)). In evaluating predominance, courts look to whether the focus of the proposed class action

10  will be on the words and conduct of the defendants rather than on the behavior of the individual

11  class members. <u>Id.</u> "[C]ourts' discomfort with individualized liability issues is assuaged in large

12  part where the plaintiff points to a specific company-wide policy or practice that allegedly gives

13  rise to consistent liability." <u>Kurihara v. Best Buy Co.</u>, 2007 WL 2501698, at *10 (N.D. Cal. Aug.

14  30, 2007). Where there exist "broad employer policies [which] can impact many workers at once

15  ... a need for class treatment" is often present. <u>Sepulveda v. Wal–Mart Stores, Inc.</u>, 237 F.R.D.

16  229, 247 (C.D. Cal. 2006).

17          "Considering whether 'questions of law or fact common to class members predominate'

18  begins, of course, with the elements of the underlying cause of action." <u>Stearns v. Ticketmaster</u>

19  <u>Corp.</u>, 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting <u>Erica P. John Fund, Inc., v. Halliburton Co.</u>,

20  563 U.S. 804, 809 (2011)). The requirement is satisfied if a plaintiff establishes that a "common

21  nucleus of facts and potential legal remedies dominates the litigation." <u>Hanlon</u>, 150 F.3d at 1022.

22          All of the claims in the 1AC—include claims for penalties and wage statement

23  violations—are predicated on NCI's company-wide policies and practices with respect to rest and

24  meal breaks, which allegedly applied to all Class Members. As noted above, NCI purports to have

25  evidence showing significant variability with respect to break practices among employees, raising

26  the possibility that NCI may ultimately be able to show that individualized questions predominate

27  over common questions, but at this point, it seems to the Court that this litigation is likely to focus

28  disproportionately on the conduct of the Defendant—as opposed to the conduct of individual Class

1 | Members—and that the predominance requirement is therefore satisfied for granting class

2 | certification for purposes of settlement.

3 |                  *2.    Superiority*

4 |      Courts are to consider "(a) the class members' interests in individually controlling the

5 | prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning

6 | the controversy already begun by or against class members; (c) the desirability or undesirability of

7 | concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in

8 | managing a class action." Fed.R.Civ.P. 23(b)(3). Where the parties have agreed to pre-certification

9 | settlement (d) and perhaps (c) are irrelevant. <u>Amchem</u>, 521 U.S. at 620; <u>Murillo v. Pac. Gas &</u>

10 | <u>Elec. Co.</u>, 266 F.R.D. 468, 473 (E.D. Cal. 2010).

11 |      The maximum gross recovery in this action, assuming Plaintiff prevails on all eight claims

12 | in the 1AC, is approximately $6.5 million, or less than $25,000 for each Class Member. That is

13 | significantly more than the average Class Member share of the MSA (approximately $2,189

14 | applying figures provided by the Parties), but it is nonetheless difficult for the Court to imagine

15 | that a possible incremental recovery of $20,000 or so could justify litigating a case of this scope,

16 | complexity and uncertainty on an individual basis. <u>Wolin</u>, 617 F.3d at 1175 ("Where recovery on

17 | an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor

18 | weighs in favor of class certification." (citation omitted)); <u>see</u> <u>also</u> <u>Wright v. Renzenberger, Inc.</u>,

19 | 2017 WL 9831398, at *12 (C.D. Cal. Sept. 30, 2017) ("Finally, as is often the case with wage and

20 | hour class actions, the individual damages of each employee are too small to make litigation cost

21 | effective.") The costs of discovery alone could not only wipe out any prospective gain for an

22 | individual plaintiff but also put an individual plaintiff at risk of losing a substantial sum of money

23 | through fees and costs even if he or she were to prevail on all claims. Finally, the Court is not

24 | aware of any pending litigation involving the subject matter of this case. The superiority

25 | requirement is therefore satisfied.

26 | **C.    Conclusion as to Class Certification**

27 |      Certification of the Class for settlement purposes appears to be warranted in most respects,

28 | but the Court is not satisfied that Gonzalez and his counsel adequately represent the interests of all

Class Members because the subclasses alleged in the 1AC imply significant variability in Class Member work histories. As set forth below, this concern is compounded by the fact that the Settlement Payment methodology applied in the Settlement Agreement appears to gloss over factors—including the length of shifts worked, the number of shifts worked, wage levels, whether a Class Member's employment with NCI was terminated during the Class Period, and whether a Class Member was employed by NCI in the final year of the Class Period—that could have a significant impact on an individual Class Member's potential recovery at trial. The Court therefore declines to certify the Class for settlement purposes based on the record currently before it.

The Court now turns to the substance of the proposed settlement.

**II.    Fundamental Fairness, Adequacy, and Reasonableness of the Settlement**

Class action settlements are permitted "only with the court's approval ... on a finding that [the agreement] is fair, reasonable, and adequate." See Fed.R.Civ.P. 23(e); Hanlon, 150 F.3d at 1026. The principal purpose of court supervision of a class action settlement is to ensure "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties ...." Id. at 1027. This "ensure[s] that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012).

Before providing final approval of a settlement, a court is to balance several factors, including: "[i] the strength of the plaintiffs' case; [ii] the risk, expense, complexity, and likely duration of further litigation [and] the risk of maintaining class action status throughout the trial; [iii] the amount offered in settlement; [iv] the extent of discovery completed and the stage of the proceedings; [and] [v] the experience and views of counsel ...." Hanlon, 150 F.3d at 1026.

Less authority exists regarding the standard a court is to use in providing preliminary approval of a settlement. See O'Connor v. Uber Technologies, Inc., 201 F.Supp.3d 1110, 1122 (C.D. Cal. 2016). Some courts save the *Hanlon* factors set forth above for the final-approval stage, focusing at the preliminary stage simply on whether the settlement "falls within the range of possible approval." Id. This includes an examination of whether the settlement is the product of non-collusive negotiations, has no obvious deficiencies, and does not otherwise improperly grant

1   preferential treatment to class representatives or segments of the class. See In re High-Tech

2   Employee Antitrust Litig., 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014). Other courts

3   examine the *Hanlon* factors in addition to conducting a range-of-reasonableness analysis at the

4   preliminary stage, reasoning it is better to closely scrutinize the settlement terms at the earliest

5   opportunity so that if a fatal flaw exists, it can be addressed before the parties "waste a great deal

6   of time and money in the notice and opt-out process." Millan v. Cascade Water Services, Inc., 310

7   F.R.D. 593 (E.D. Cal. 2015). The Court agrees with the latter approach, and thus applies both the

8   *Hanlon* factors and the range-of-reasonableness analysis here.

9         **A.**    **Strength of Plaintiff's Case**

10       A court should "evaluate objectively the strengths and weaknesses inherent in the litigation

11  and the impact of those considerations on the parties' decisions to reach these agreements."

12  Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d 964, 975 (E.D. Cal. 2012) (citation omitted).

13  That in mind, a court need "not reach 'any conclusions regarding the contested issues of fact and

14  law that underlie the merits of th[e] litigation.' " Brewer v. Salyer, 2017 WL 2813178, at *3 (E.D.

15  Cal. June 29, 2017).

16       NCI filed an Answer to the original Complaint in Superior Court denying all material

17  allegations, in addition to denying that any of Gonzalez's rights were violated, that Gonzalez has

18  suffered damages as a result of NCI's actions and that Gonzalez is an adequate representative of

19  the putative class. Doc. No. 1, page 59 of 72, lines 4 through 9. Further, the Answer alleged two

20  dozen affirmative defenses, including defenses that Gonzalez lacks standing; that some or all

21  putative class members were exempt from break requirements under applicable law; and that meal

22  and rest breaks were duly provided to Gonzalez and some or all putative class members. Doc. No.

23  1, pages 58 through 63 of 72.

24       NCI has not yet answered the 1AC but states in the Settlement Agreement that it "denies

25  all of the claims as to liability, damages, penalties, and restitution as well as the class

26  representative allegations," Doc. No. 19, page 5 of 48, lines 8 through 10, and that it intends to

27  "challenge class and/or representative treatment" and to "assert any and all defenses or privileges"

28  if this action proceeds. Id., page 5 of 48, lines 20 through 25.

As to the meal and rest break claim, in particular, it appears that NCI may have evidence showing that there was no common policy or practice requiring employees to remain at their stations until the beginning of a break or to return to their work stations by the last minute of a break; that the 15 minutes provided for rest breaks was sufficient to provide the 10 minutes of "net rest" required by law, even when allowing for the doffing and donning of protective gear; that it forbids employees from performing any off-the-clock work; and that it allows employees to doff and don protective equipment outside of break time. Doc. No. 18, page 25 of 32, line 23, through page 26 of 32, line 2. Inasmuch as Gonzalez's rest and meal break claims provide the foundation for this case, Gonzalez's willingness to settle at a substantial discount to the maximum estimated recovery does not appear suspect or improvident in light of NCI's posture and potential evidence.

**B.      The Risk, Expense, Complexity and Likely Duration of Further Litigation and the Risk of Maintaining Class Action Status Throughout Trial**

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.' " Munoz v. Giumarra Vineyards Corp., 2017 WL 2665075, at \*9 (E.D. Cal. June 21, 2017); see also In re Syncor ERISA Litig., 516 F.3d 1095, 1101 (9th Cir. 2008) ("[T]here is a strong policy that favors settlements, particularly where complex class action litigation is concerned."). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and expensive to litigate." Aguilar v. Wawona Frozen Foods, 2017 WL 2214936, at \*3 (E.D. Cal May 19, 2017).

Even assuming Gonzalez can show that NCI had unlawful company-wide policies and practices with respect to rest and meal breaks that resulted in lost break time, underpayment, inaccurate wage statements and such, individualized proof could still be required to establish the extent to which a given employee was deprived of breaks and compensation, as reflected in the considerable variations in shift lengths across the numerous subclasses alleged in the 1AC. In addition to increasing the complexity, expense and duration of this litigation, the accumulation of such individualized issues could amplify the risk of non-certification at some point in these proceedings. See Doc. No. 18, page 26 of 32, lines 4 through 14. There is also risk involved in seeking non-mandatory PAGA penalties, and it is unlikely, for a variety of reasons, that trial in

this action would commence in the near future. Moreover, even assuming Gonzalez prevails, payment could be further delayed (and expenses could be further increased) by appeal. The potential costs of maintaining this action through trial and appeal merit particular consideration in light of the fact that that maximum estimated damages for all claims in the 1AC are only about $6.5 million, much of which could be consumed in protracted litigation involving numerous claims, a somewhat sizeable Class, and possibly several subclasses. The Court therefore finds that the risks, costs and duration of further litigation, as well as the potential risks attendant to a contested class certification, weigh in favor of preliminary approval of the settlement.

## C.     The Amount Offered in Settlement

The amount offered in settlement is generally considered to be the most important consideration of any class settlement. See Bayat v. Bank of the West, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015) (citing, *inter alia*, In re HP Inkjet Printer Litig., 716 F.3d 1173, 1178-79 (9th Cir. 2013)). To determine whether a settlement amount is reasonable, the Court must consider the amount obtained in recovery against the estimated value of the class claims if successfully litigated. Litty v. Merrill Lynch & Co., Inc., 2015 WL 4698475, at *9 (C.D. Cal. Apr. 27, 2015) (quoting In re Mego Financial Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000)). A settlement "amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair," Officers for Justice v. Civil Service Com'n of City and Cty. of S.F., 688 F.2d 615, 628 (9th Cir. 1982), and Courts approve class settlements where class members recover a small fraction of the maximum potential recovery amount. See Bravo v. Gale Triangle, Inc., 2017 WL 708766, at *10 (C.D. Cal. Feb. 16, 2017) (approving a settlement where net recovery to class members was approximately 7.5% of the projected maximum recovery amount); Bellinghausen v. Tractor Supply Co., 306 F.R.D. 245, 256 (N.D. Cal. 2015) (approving a settlement where the gross recovery to the class was approximately 8.5% of the maximum recovery amount).

Here, the MSA represents only about 9% of the maximum value of the Class claims if successfully litigated, as estimated by Gonzalez's counsel. Gonzalez asserts that this is a "fair, adequate and reasonable" settlement value because it "provides [] workers with a definite recovery

and is in proportion to the strengths and challenges associated with all claims." Doc. No. 18, page 31 of 31, lines 14 through 18. Gonzalez notes, in particular, that the Court may find that the claims in question are not suitable for class treatment given variability in the break habits of employees and the fact that NCI claims to have evidence showing that it forbids off-the-clock work, while permitting employees to doff / don protective gear and walk to break areas while on the clock. Failure to maintain class certification would be particularly injurious to Class Members, Gonzalez argues, because with a combined maximum value of $25,000 or less, the claims at issue here may be too low in value to pursue individually.

It is hard to deny that the MSA is modest is comparison to the maximum potential value of the claims set forth in the 1AC, but factors such as those described above—including significant variability in the work histories and break habits of Class Members, for example—could make it difficult to maintain class certification and establish liability on a class basis. Moreover, it appears that, even if class certification is maintained throughout these proceedings, evidence could well show that NCI's policies and practices with respect to breaks were lawful. The Court therefore finds that while the MSA and NSA are small relative to the maximum possible recovery, this factor does not preclude settlement.

### D.     The Extent of Discovery Completed

The Court should lean in favor of a settlement where evidence is presented that a considerable amount of discovery has been conducted "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." Adoma, 913 F.Supp.2d at 977 (citation omitted).

Here, NCI produced hundreds of documents including employee handbooks and policy manuals, earning statements, personnel files, break logs, job descriptions and work tasks, as well as tens of thousands of lines of time records. Further, the Parties participated in a mediation with a retired Superior Court judge and signed the term sheet on which the Settlement Agreement is based as a result of that mediation. It therefore appears that the Parties have developed a full understanding of the legal and factual issues underlying this action. This factor weighs in favor of granting preliminary approval of the settlement.

1    **E.      The Experience and Views of Counsel**

2          Gonzalez's counsel has significant experience in wage and hour class action litigation and

3    hold the view that the settlement is "in the best interests of the [C]lass as fair, reasonable, and

4    adequate." Doc. No. 18-1 ¶¶ 1-23. The recommendation of counsel typically merits "[g]reat

5    weight," Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D.

6    Cal. 2004), but in light of concerns raised above as to the adequacy of representation for the Class

7    as a whole, the Court cannot find at this point in the proceedings that this factor weighs in favor of

8    settlement.

9    **F.      Range-of-Reasonableness: Collusion, Deficiencies, Preferential Treatment**

10         The Court now turns to whether any collusion, deficiencies, or preferential treatment

11   exists. See In re High-Tech Employee Antitrust Litig., 2014 WL 3917126, at *3. As noted above,

12   the goal of this analysis is to ensure that class representatives and their counsel do not receive a

13   disproportionate benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to

14   represent." Lane, 696 F.3d at 819. To that end, the Ninth Circuit has identified three "subtle signs

15   that class counsel have allowed pursuit of their own self-interests ... to infect the negotiations:"

16   "(1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties

17   negotiate a 'clear sailing' arrangement (i.e., an arrangement where defendant will not object to a

18   certain fee request by class counsel); and (3) when the parties create a reverter that returns

19   unclaimed fees to the defendant." Allen v. Bedolla, 787 F.3d 1218, 1224 (9th Cir. 2015) (quoting

20   In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011)) (internal quotation

21   marks omitted); see also, Staton v. Boeing Co., 327 F.3d 938, 960 (9th Cir. 2003) (stating the

22   collusion inquiry addresses "overt misconduct by the negotiators" or improper incentives of some

23   class members at the expense of others). However, as stated by the Ninth Circuit, "[f]or all these

24   factors, considerations, 'subtle signs,' and red flags, ... the underlying question remains this: Is the

25   settlement fair?" In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,

26   895 F.3d 597, 611 (9th Cir. 2018).

27         Here, the $5,000 enhancement fee for Gonzalez appears to be in line with prevailing

28   norms, see Hopson v. Hanesbrands Inc., 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) ("In

general, courts have found that $5,000 incentive payments are reasonable."), as does the proposed maximum of $150,000 in attorneys' fees—which would amount to 25% of the MSA. See Bluetooth, 654 F.3d at 947 (referencing a 25% "benchmark" for attorneys' fees); Staton, 327 F. 3d at 968 (same); Ross v. Bar None Enterprises, Inc., 2014 WL 4109592, at *10 (E.D. Cal. Aug. 19, 2014) (stating that "[t]he typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark" (citation omitted)). The Court is also comfortable with the proposed maximum fee of $15,000 for the Settlement Administrator, see Vasquez v. Coast Valley Roofing, Inc., 266 F.R.D. 482, 483 (E.D. Cal. 2010) (approving a $25,000 administrator fee in wage and hour case involving 177 potential class members), and notes that the settlement is non-reversionary. See Doc. No. § 2.8.5. All of these factors favor approval of the settlement.

The fact that the Settlement Agreement contains a "clear sailing provision" in which NCI agrees not to challenge the requested award of attorney fees is not ideal, Doc. No. 19 § 1.2, page 8 of 48, but that provision is offset, in the Court's view, by the fact that the proposed attorneys' fees are squarely in line with applicable benchmarks and the fact that the MSA is non-reversionary.

The potential $30,000 in litigation expenses, Doc. No. 19 § 1.18, seems high given the relatively limited scope and short duration of this action to date and the fact that the requested costs represent 20% of the requested attorneys' fees. The Court would not deny preliminary approval of the settlement on that basis but would expect to see additional justification for these costs before granting final approval to guard against the possibility that costs are being used to augment the award of attorneys' fees.

Of greater consequence, the Court has concerns regarding the calculation methodology for the Settlement Payments.

As set forth above, "Settlement Payment" is defined as "the gross, total amount due to an individual Settlement Class Member, which shall be the product of the Work Week Value multiplied by that Settlement Class Member's number of Qualifying Work Weeks." Doc. No. 19 § 1.33. "Qualifying Work Week" is defined as "any calendar week, i.e., seven consecutive days from Monday to Sunday during the Class Period in which a Class Member worked for [NCI] at

least one day in the Calendar Week." <u>Id.</u> § 1.27. "Work Week Value" is defined as the "quotient of the NSA divided by the total number of Qualifying Work Weeks for all Class Members." <u>Id.</u> § 1.38. Thus, as noted above, it appears that a Class Member who worked just one day in each week of the Class Period would receive just as much compensation as a Class Member who worked five days in each week of the Class Period, even where the latter Class Member commanded a higher straight wage and worked longer shifts with more breaks and overtime.

This would not necessarily be grounds to deny preliminary approval of the settlement if there were some showing as to general uniformity in wages, shift length, and days worked per week across the Class, but the Court sees no meaningful facts to that effect in the record. In fact, the 1AC identifies multiple subclasses based on different shift lengths ranging from as few as two hours to as many as 12 hours. Moreover, the Settlement Payment methodology fails to take account of whether the employment of a given Class Member was terminated during the Class Period or whether a given Class Member was employed with NCI during the final year of the Class Period, even though claims based on such factors together appear to account for more than 15% of the maximum possible recovery in this case. Thus, the Court cannot find on the record before it that the compensation scheme in the Settlement Agreement is fair to all Class Members.

## G.    Conclusion as to Fairness, Adequacy, and Reasonableness of the Settlement

Although the proposed settlement appears to be acceptable in most respects, the Court sees reason to doubt that the Settlement Payment methodology adequately reflects the rights and interests of all Class Members and will deny preliminary approval of the settlement on that basis.

## III.    CONCLUSION

The Court cannot certify the Class for settlement purposes or grant preliminary approval of the settlement because the Court is not satisfied, based on the record before it, that the interests of all Class Members have been adequately represented or taken into account in structuring the settlement. Specifically, it appears to the Court that Class Members who worked a large number of long shifts at high straight wages—as well as Class Members whose employment with NCI was terminated during the Class Period and/or who were employed with NCI in the year prior to the filing of this lawsuit—may get shorted in the calculation of Settlement Payments. These concerns

can potentially be addressed through additional facts showing uniformity in the work histories of the putative Class Members, modifications to the Settlement Payment calculation methodology or some other means, so the motion will be denied without prejudice to bringing another motion for settlement approval if and when circumstances warrant doing so.

In light of the foregoing, it is unnecessary for the Court to address the adequacy of notice, the scope of the release, or appointment of the Settlement Administrator.

## **ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's motion for preliminary approval of class action settlement (Doc. No. 18) is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated:   August 6, 2020

_____

SENIOR  DISTRICT  JUDGE