# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTURO GONZALEZ on behalf of himself, all others similarly situated, and on behalf of the general public,<br><br>　　　　　　Plaintiffs,<br>　v.<br><br>NCI GROUP, INC., dba NCI BUILDING SYSTEMS; and DOES 1-100,<br><br>　　　　　　Defendants. | Case No.: 1:18-cv-00948-AWI-SKO<br><br>**ORDER GRANTING PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>(Doc. No. 24) |

   Plaintiff Arturo Gonzalez brings a renewed motion for preliminary approval of class action settlement. Doc. No. 24. The motion is unopposed and the Court has deemed it suitable for decision without oral argument pursuant to Local Rule 230(g). See Doc. No. 26. For the reasons set forth below, the motion will be granted.

## BACKGROUND

**A.    First Amended Complaint**

   As set forth in the First Amended Complaint ("1AC"), Defendant NCI Group, Inc. ("NCI") manufactures and markets metal building systems and components for the nonresidential construction industry. Doc. No. 17 ¶ 38. Gonzalez was employed by NCI at times relevant to this action as a non-exempt, hourly shipping checker in California. Id. ¶ 26.

   Gonzalez filed this putative class action in Merced County Superior Court on June 6, 2018, on behalf of himself and others similarly situated, including warehouse workers, industrial

workers, shipping clerks and other categories of non-exempt, hourly workers in NCI's employ in California during the four-year period prior to commencement of this action. Doc. No. 1 ¶¶ 2, 4. NCI answered the Complaint on July 11, 2018, id., Ex. B, and removed the case to this Court on diversity grounds under the Class Action Fairness Act ("CAFA") on July 12, 2018. Id. The 1AC was filed on February 3, 2020. Doc. No. 17.

The 1AC alleges eight causes of action under the California Labor Code, California's Unfair Competition Law and the Industrial Welfare Commission's ("IWC") California Wage Orders based primarily on allegations that NCI had a policy and/or practice of failing to pay non-exempt hourly employees for missed break time. Doc. No. 17. For example, Gonzalez contends that NCI failed to provide proper compensation for time spent walking to and from break areas and time spent doffing and donning protective gear prior to and following breaks, in addition to failing to provide proper compensation for breaks that were missed completely. See Doc. No. 18 at 18:23- 28.

The 1AC defines the putative class ("Class") as "[a]ll persons who are employed or have been employed by [NCI] in the State of California as hourly, Non-Exempt employees during the period of the relevant statute of limitations." Doc. No. 17 ¶ 44. Further, the 1AC alleges subclasses defined as all persons within the Class who worked: (i) one or more shifts in excess of five hours; (ii) one or more shifts in excess of six hours; (iii) one or more shifts in excess of 10 hours; (iv) one or more shifts in excess of 12 hours; (v) one or more shifts in excess of two hours; (vi) one or more shifts in excess of three and one-half hours, but less than or equal to six hours; and (vii) one or more shifts in excess of six hours, but less than or equal to 10 hours.[1] Id.

**B.     August 6, 2020 Order**

Gonzalez and NCI reached a settlement agreement ("Settlement Agreement") following mediation that took place on November 19, 2019 with a retired Superior Court judge. Doc. No. 19, Ex. A; see also, Doc. No. 18 at 11:11-14.[2] On February 3, 2020, Gonzalez brought an unopposed

---

[1] This information is provided for context. Certification of subclasses is not sought on this motion or addressed in this order.

[2] Page citations to documents on the Court's electronic docket are to the page number in the CM/ECF stamp at the top of each page.

motion for an order: (i) granting conditional certification of the Class for settlement purposes; (ii) preliminarily approving the proposed settlement; (iii) approving notice to the Class ("Class Notice") and the plan for distribution of Class Notice; (iv) appointing an administrator for the settlement ("Settlement Administrator"); and (v) setting a Final Approval Hearing. Doc. No. 18 at 2.

The Court issued an order denying the motion without prejudice on August 6, 2020. Doc. No. 21. In that order, the Court addressed the requirements for class actions under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure,[3] as well as the fairness, reasonableness and adequacy of the proposed settlement under Rule 23(e)(2). See id. The order did not address the scope of the release in the Settlement Agreement, notice, the appointment of the Settlement Administrator or other such issues. See id. at 22:5-6.

*Findings in the August 6, 2020 Order as to Class Certification*

Rule 23(a) provides that the following four criteria "must be met to certify a class action: (1) numerosity; (2) commonality of law or fact; (3) typicality of the representative plaintiff's claims; and (4) adequacy of representation." Gripenstraw v. Blazin' Wings, Inc., 2013 WL 6798926, at *3 (E.D. Cal. Dec. 20, 2013) (Ishii, J.); Fed.R.Civ.P. 23(a). The Court found in the August 6, 2020 order that numerosity, commonality and typicality had been satisfied. Doc. No. 21 at 8:4-10:8. The Court also found, however, that Gonzalez had failed to show that the adequacy requirement had been met because "the Settlement Agreement [did] not take account of differences among Class Members with respect to wage levels, shift lengths or the number of shifts worked per week" and Plaintiff and his counsel "could have a conflict with the Class to the extent other Class Members worked a larger number of longer shifts at higher wages" than Gonzalez. Id. at 10:15-24. The Court also stated as follows:

> … [I]t may well be that there is uniformity in the number and length of shifts worked by Class Members and in the wages that Class Members were paid. Such assumptions, however, are at odds with common sense and in tension with the fact that the 1AC alleges multiple subclasses based on shift lengths ranging from two hours to 12 hours. [citations] The Court therefore needs more information as to how Gonzalez's work history compares to the work histories of other Class

---

[3] Unless otherwise indicated, "Rule" refers to the Federal Rules of Civil Procedure.

1
2
    Members to resolve its concern about potential conflicts and to get comfort that Gonzalez and his counsel (however capable) adequately represent the interests of all Class Members.

3 Id. at 11:5-12.

4     In other words, the Court found "that numerosity, typicality and commonality [were]

5 satisfied for purposes of the Rule 23(a) analysis of the settlement, but that more information [was]

6 required to determine whether Gonzalez and his counsel are adequate representatives of the

7 proposed Class as a whole." Doc. No. 21 at 11:14-17.

8     As to the second step of the class action analysis, Gonzalez sought certification under Rule

9 23(b)(3), which requires a showing that: (1) questions of law or fact common to class members

10 predominate over any questions affecting only individual members; and (2) a class action is

11 superior to other available methods for fairly and efficiently adjudicating the controversy. See

12 Fed.R.Civ.P. 23(b)(3); Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 593 (1997); Doc. No. 21 at

13 11:20-24. The Court found that Gonzalez had satisfied both requirements. See Doc. No. 21 at

14 12:3-12:25.

15     In light of the foregoing analyses under Rules 23(a) and 23(b)(3), the Court summarized its

16 findings with respect to class certification as follows:

17
18
19
20
21
22
23
    Certification of the Class for settlement purposes appears to be warranted in most respects, but the Court is not satisfied that Gonzalez and his counsel adequately represent the interests of all Class Members because the subclasses alleged in the 1AC imply significant variability in Class Member work histories. …[T]his concern is compounded by the fact that the Settlement Payment methodology applied in the Settlement Agreement appears to gloss over factors—including the length of shifts worked, the number of shifts worked, wage levels, whether a Class Member's employment with NCI was terminated during the Class Period, and whether a Class Member was employed by NCI in the final year of the Class Period—that could have a significant impact on an individual Class Member's potential recovery at trial. The Court therefore declines to certify the Class for settlement purposes based on the record currently before it.

24 Doc. No. 21 at 13:27-14:8.

25     *Findings in the August 6, 2020 Order as to the Settlement Agreement*

26     Class action settlements are permitted "only with the court's approval ... on a finding that

27 [the settlement] is fair, reasonable, and adequate." See Fed.R.Civ.P. 23(e); Hanlon v. Chrysler

28 Corp., 150 F.3d 1011, 1026 (9th Cir. 1998), overruled on other grounds by Wal-Mart Stores v.

1  Dukes, 564 U.S. 338 (2011). The principal purpose of court supervision of a class action
2  settlement is to ensure "the agreement is not the product of fraud or overreaching by, or collusion
3  between, the negotiating parties ...." Id. at 1027. This "ensure[s] that class representatives and their
4  counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class
5  counsel had a duty to represent." Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012).

6      To address such issues, courts balance several factors (sometimes referred to as the
7  "*Hanlon* factors") before providing final approval of a settlement, including: "[i] the strength of
8  the plaintiffs' case; [ii] the risk, expense, complexity, and likely duration of further litigation [and]
9  the risk of maintaining class action status throughout the trial; [iii] the amount offered in
10 settlement; [iv] the extent of discovery completed and the stage of the proceedings; [and] [v] the
11 experience and views of counsel ...." Hanlon, 150 F.3d at 1026.

12     At the preliminary approval stage, some courts look only at whether the settlement "falls
13 within the range of possible approval." See O'Connor v. Uber Technologies, Inc., 201 F.Supp.3d
14 1110, 1122 (C.D. Cal. 2016). This includes an examination of whether the settlement is the
15 product of non-collusive negotiations, has no obvious deficiencies, and does not otherwise
16 improperly grant preferential treatment to class representatives or segments of the class. See In re
17 High-Tech Employee Antitrust Litig., 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014). Other
18 courts, however, examine the *Hanlon* factors in addition to conducting a range-of-reasonableness
19 analysis at the preliminary approval stage to weed out fatal flaws in a proposed settlement before
20 additional resources are expended on the notice and opt-out process. See Millan v. Cascade Water
21 Services, Inc., 310 F.R.D. 593 (E.D. Cal. 2015).

22     In its August 6, 2020 order, the Court applied both the *Hanlon* factors and the range-of-
23 reasonableness analysis. See Doc. No. 21 at 15:9-21:20. In doing so, the Court found "reason to
24 doubt that the Settlement Payment methodology adequately reflects the rights and interests of all
25 Class Members," id. at 21:18-20, and Court stated as follows:

26     The Court cannot certify the Class for settlement purposes or grant preliminary
    approval of the settlement because the Court is not satisfied, based on the record
27     before it, that the interests of all Class Members have been adequately represented
    or taken into account in structuring the settlement. Specifically, it appears to the
28     Court that Class Members who worked a large number of long shifts at high

straight wages—as well as Class Members whose employment with NCI was terminated during the Class Period and/or who were employed with NCI in the year prior to the filing of this lawsuit—may get shorted in the calculation of Settlement Payments. These concerns can potentially be addressed through additional facts showing uniformity in the work histories of the putative Class Members, modifications to the Settlement Payment calculation methodology or some other means, so the motion will be denied without prejudice to bringing another motion for settlement approval if and when circumstances warrant doing so.

Id. at 21:22-4.

**PLAINTIFF'S RENEWED MOTION & THE AMENDED SETTLEMENT AGREEMENT**

On January 28, 2022, Gonzalez filed a renewed motion—which is also unopposed—for an order: (1) provisionally granting Class certification for settlement purposes; (2) preliminarily approving an amended settlement agreement ("Amended Settlement Agreement"); (3) approving the proposed Class Notice and the plan for distribution of the Class Notice; (4) appointing a Settlement Administrator; and (5) scheduling a Final Approval Hearing. Doc. No. 24 at 2.

The Amended Settlement Agreement is set forth in an amended stipulation filed with the motion. See Doc. No. 24-2. The Amended Settlement Agreement differs from the Settlement Agreement an issue in Gonzalez's February 3, 2020 motion, see Doc. No. 18, in that it uses claim-specific subclasses and methodologies based on the actual wages and work histories of Class Members to calculate individualized settlement payments.

Like the Settlement Agreement, the Amended Settlement Agreement seeks to settle this action on behalf of a single Class defined as "all non-exempt current and former employees who worked for [NCI] as hourly warehouse workers, industrial workers, shipping checkers, distribution employees, shipping clerks, packers, stackers, loaders, packaging clerks, machine operators, receiving clerks, production workers, and all other similarly situated employees in California at any time during the Class Period." Doc. No. 24-2, Part VI, §1.4. The Class Period is defined as the period from June 6, 2014 through February 24, 2020, id., Part VI, §1.8, and the Class comprises approximately 274 current and former NCI employees ("Class Members" or, individually, "Class Member"). Id., Part VI, §1.4.

Unlike the Settlement Agreement, however, the Amended Settlement Agreement identifies three subclasses (based on claim types) for purposes of calculating settlement payments: (i) the Meal, Rest, and Unpaid Wages Subclass, which includes all Class Members; (ii) the Waiting Time

Penalties Subclass, which includes all Class Members who worked for NCI at any time from June 6, 2015 through February 24, 2020, and who are no longer employed by Defendant; and (iii) the Wage Statement and PAGA Subclass, which includes all Class Members who worked for NCI from June 6, 2017 through February 24, 2020.[4] Doc. No. 24-2, Part VI, §1.4.

Per the Amended Settlement Agreement, NCI will pay a Maximum Settlement Amount ("MSA")—defined as "the maximum total that can be paid by [NCI]" pursuant to the Amended Settlement Agreement—of $600,000 (or approximately $2,190 per Class Member). Doc. No. 24-2, Part VI, §1.24. The MSA will cover: (i) settlement payments to Class Members who do not opt out of the settlement ("Settlement Class Members"); (ii) attorneys' fees to Class Counsel in an amount not to exceed $150,000; (iii) litigation expenses to Class Counsel, in an amount not to exceed $30,000; (iv) an "enhancement payment" to Gonzalez for services rendered and risk assumed as the named plaintiff in an amount not to exceed $5,000; (v) administration fees and expenses to the Settlement Administrator in an amount not to exceed $15,000; and (vi) a payment to the California Labor and Workforce Development Agency ("LWDA") and Settlement Class Members under the Private Attorneys General Act ("PAGA") of $60,000 ($45,000 to the LWDA and $15,000 to Settlement Class Members) ("PAGA Payment"). Id.

The Net Settlement Amount ("NSA") is the amount remaining for disbursement to Settlement Class Members after subtracting from the MSA attorneys' fees and litigation expenses, the enhancement payment, settlement administration costs, and the LWDA portion of the PAGA payment. Doc. No. 24-2, Part VI, §1.27. The estimated NSA is $370,000, for an average of approximately $1,350 per Class Member. Id. at 8:16-17, n.2.

In these respects, the Amended Settlement Agreement is identical to the Settlement Agreement. Compare Doc. No. 24-2 at 10:5-21 to Doc. No. 18-1 at 21:16-22:10. Unlike the Settlement Agreement, however, the Amended Settlement Agreement provides that the NSA shall

---

[4] The timeframes for the Waiting Time Penalties Subclass and the Wage Statement and PAGA Subclass reflect the statutes of limitation applicable to the underlying violations, which differ from those applicable to violations involving meal breaks, rest breaks and unpaid wages. See Doc. No. 24 at 10:24-11:1. Further, the Waiting Time Penalties Subclass is limited to Class Members who are no longer employed by Defendants, since termination of employment is a precondition for recovery of waiting time penalties. See id.

7

be divided into three payout funds: (i) the Meal, Rest, and Unpaid Wages Payout Fund, comprising 83% of the NSA; (ii) the Waiting Time Penalties Payout Fund, comprising 7% of the NSA; and (iii) the Wage Statement Payout Fund, comprising 10% of the NSA. Doc. No. 24-2, Part VI, §1.27. The total payment to each Settlement Class Member will be the sum of the amounts to which a given Settlement Class Member is entitled from each of these three funds, id., Part VI, §1.41, which "are tied to the unique circumstances of each Class Member." Doc. No. 24 at 14:6-7.

As to the first of these three funds—the Meal, Rest, and Unpaid Wages Payout Fund—Meal, Rest, and Unpaid Wages Individual Adjusted Shifts are calculated for each member of the Meal, Rest, and Unpaid Wages Subclass by multiplying the number of shifts a given Subclass Member worked during the Class Period by the Adjusted Shift Multiplier for that Subclass Member (which is the Subclass Member's last known pay rate times .1). Individual Adjusted Shifts for all Subclass Members are combined to come up with the Total Adjusted Meal, Rest, and Unpaid Shifts. The Unpaid Wages Payout Fund is divided by the Total Adjusted Meal, Rest and Unpaid Shifts to get the Meal, Rest, and Unpaid Shift Value, which is then multiplied by the Individual Adjusted Shifts for a given Subclass Member to generate a customized award reflecting rate of pay and number of shifts worked. See Doc. No. 24 at 14:7-18; Doc. No. 24-2, Part VI, §§1.1, 1.25, 1.26, 1.44.

Awards from the Waiting Time Penalties Payout Fund are calculated using parallel methodology. Waiting Time Penalties Individual Adjusted Shifts are calculated for each Waiting Time Penalties Subclass Member by multiplying the number of shifts the Subclass Member worked from June 6, 2015 through February 24, 2020 by the Subclass Member's Adjusted Shift Multiplier (the Subclass Member's last known pay rate times .1). The Individual Adjusted Shifts for all Subclass Members are combined to get the Total Adjusted Waiting Time Penalties Shifts. The Waiting Time Penalties Payout Fund is divided by the Total Adjusted Waiting Time Penalties Shifts to get the Waiting Time Penalties Shift Value, which is then multiplied by the Individual Adjusted Shifts for a given Subclass Member to generate a customized award reflecting rate of pay and number of shifts worked. Doc. No. 24 at 14:18-15:6; Doc. No. 24-2, Part VI, §§1.1, 1.45, 1.51 and 1.52.

Finally, a Settlement Class Member may be entitled to a payment from the Wage Statement Payout Fund and the PAGA Payout Fund[5] if he or she is a member of the Wage Statement and PAGA Subclass. Here, the Qualifying Pay Periods for a given Subclass Member are the pay periods in which the Subclass Member worked from June 6, 2017 through February 24, 2020.[6] Total Pay Periods is the sum of Qualifying Pay Periods for all members of the Wage Statement and PAGA Subclass. The Wage Statement Payout Fund and PAGA Payout Fund are then divided by Total Pay Periods to generate a Pay Period Value, which is then multiplied by the Qualifying Pay Periods for a given Subclass Member to generate a customized award reflecting the number of pay periods worked during the relevant period. Doc. No. 24 at 15:7-18; Doc. No. 24-2, Part VI, §§1.33, 1.35 and 1.46.

Aside from the foregoing modifications with respect to the creation of claim-centric funds and methodologies for calculating individualized settlement payments, the Amended Settlement Agreement does not differ materially from the Settlement Agreement. Compare Doc. No. 24-2 to Doc. No. 18-1 at 13-56.

## DISCUSSION

The Court will first address conditional Class certification and preliminary approval of the Amended Settlement Agreement, and then turn to other issues, such as Class Notice.

**A.  Conditional Class Certification and Preliminary Approval of Amended Settlement Agreement**

As set forth above, the Court denied Gonzalez's February 3, 2020 motion on findings that failure to address potential disparities in the wages, work histories and employment status of Class Members cast doubt on his adequacy as a class representative and the fairness of payments to Class Members under the Settlement Agreement.

Here, Gonzalez sets forth a declaration showing that Class Members worked over five hours in approximately 97.8% of shifts and overtime in approximately 90% of shifts between June

---

[5] The PAGA Payout Fund is the 25% of the PAGA Payment to be distributed to Settlement Class Members (as opposed to the LWDA). Doc. No. 24-2, Part VI, §1.32.2.

[6] The Adjusted Shift Multiplier is not applied because penalties for wage statement and PAGA claims are statutorily prescribed and do not take pay rate into consideration. See Doc. No. 24 at 15:14-18.

9

6, 2014 and February 24, 2020. Doc. No. 24-1 at 8:19-20; Doc. No. 24-3 at 2. Gonzalez argues that "his work history is in line with that of the Class Members" because he worked "five or more hours in 100% of his shifts and worked overtime in 91% of his shifts." Doc. No. 24 at 21:24-26. Further, he argues that differences in the hourly wages of Class Members—and in the number of shifts worked by Class Members—are adequately addressed through the claim-centric funds and individualized methodologies for calculating awards set forth in the Amended Settlement Agreement. Id. at 22:4-10. Similarly, the creation of the Waiting Time Penalties Subclass limits payment of waiting time penalties to Class Members whose employment with NCI has been terminated. Id. at 10:25-11:1.

      The additional information Gonzalez has provided with respect to work histories and the new protocols in the Amended Settlement Agreement for calculating settlement payments persuade the Court that Gonzalez's interests are sufficiently aligned with those of other Class Members for him to serve as the named plaintiff in this action and that "the interests of all Class Members have been adequately represented … in structuring the settlement." See Doc. No. 21 at 21:22-25.

      Further, the record shows that David Mara, Jill Vecchi and the Mara Law Firm have considerable experience litigating relevant class actions. See Doc. No. 24-1. David Mara has litigated over 350 class actions and PAGA lawsuits over a period of approximately 15 years. Doc. No. 24-1 at 4:19-25. And although she has not been practicing as long, Vecchi focuses solely on PAGA actions and wage and hour actions, and has handled more than 100 such cases over the past six years, in a managerial capacity and otherwise. Id. at 6:6-14. The Court therefore finds that the Mara Law Firm—and specifically, Mara and Vecchi—can adequately represent the Class as Class Counsel.

      Finally, class action settlement agreements cannot release claims of absent class members that are unrelated to the factual allegations of the class complaint. Hesse v. Sprint Corp., 598 F.3d 581, 590 (9th Cir. 2010). The Amended Settlement Agreement states that the release applies only to claims arising from "facts alleged in the Complaint, that accrued during the Class Period" and that the release does not extend to claims, such as wrongful termination, "that do not arise from

1  the facts alleged in the Complaint." Doc. No. 24 at 17:2-18:15. The Court therefore finds that the
2  scope of the release is satisfactory.[7]

3        Having already found in its August 6, 2020 order that other applicable requirements have
4  been satisfied, see Doc. No. 21, the Court will grant conditional Class certification for purposes of
5  settlement, as well as preliminary approval of the Amended Settlement Agreement.

6  **B.      Notice**

7        For any class certified under Rule 23(b)(3), "the court must direct to class members the
8  best notice that is practicable under the circumstances." Fed.R.Civ.P. 23(c)(2)(B). The absent class
9  members must be provided with notice, an opportunity to be heard, and a right to opt-out of the
10 class. AT & T Mobility LLC v. Concepcion, 563 U.S. 333, 349 (2011). "The notice must clearly
11 and concisely state in plain, easily understood language" the following information:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

16 Fed.R.Civ.P. 23(c)(2)(B).

17       The proposed notice in this action satisfies all these requirements. The notice form, for
18 example, provides a clear and accurate description of the Class, the nature of the claims and the
19 substance of the proposed settlement, as well as concise, easy-to-understand instructions in clearly
20 marked sections for objecting, opting out and such. See Doc. No. 24-2 at 44-51. Similarly, the
21 notice plan calls for an ample 45-day window for objections and opt-outs, see, e.g., id. Part VI,
22 §§1.37, 2.6.2, as well as thorough measures to reach class members, including a website, email,
23 standard mail, skip tracing and, where necessary and feasible, second mailings. Id. Sec. VI, §2.5.
24 The Court therefore finds that the proposed notice is adequate.[8]

---

[7] There is no material difference between the factual allegations in the Complaint and the factual allegations in the 1AC. Compare Doc. No. 1, Ex. A to Doc. No. 17.

[8] One minor issue the Court notes is that the notice form states at page 2 that "[a] Preliminary Approval Hearing was held [on date of preliminary approval hearing], in the United States District Court, Eastern District of California." Doc. No. 24-2 at 45 (brackets original). That is not correct since the Court deemed the renewed motion suitable for decision without oral argument pursuant to Local Rule 230(g). See Doc. No. 26. The Court will order that the notice

11

**C.      Final Approval Hearing**

As to schedule, the Amended Settlement Agreement states that NCI shall provide a contact database for Class Members to the Settlement Administrator selected by the parties—Rust Consulting, Inc.—within 7 business days of entry of a Preliminary Approval Order. Doc No. 24-2 at 18:22-23. The Settlement Administrator will mail the Class Notice to all identified Class Members within 21 business days of entry of the Preliminary Approval Order (with additional attempts to deliver returned mail as warranted). Id. at 19:21-23. Class Members will have 45 days from the initial mailing of Class Notice ("Response Deadline") to object, opt out or otherwise respond to the Class Notice. Id. at 13:9-11. Within 5 business days of the Response Deadline, the Settlement Administrator will provide counsel for the parties with a complete and accurate accounting as to the delivery of the Class Notice to Class Members, and within 14 calendar days after the Response Deadline, the Settlement Administrator will provide the parties with a declaration of due diligence setting forth its compliance with its obligations under the Amended Settlement Agreement and corresponding stipulation. Id. at 26. Class Counsel will then file an unopposed motion for final approval of the Amended Settlement Agreement. Id. at 26-27.

The Court approves this schedule and will set the Final Approval Hearing for **January 23, 2023** to allow adequate time for the foregoing events to take place.

## ORDER

Accordingly, IT IS HEREBY ORDERED as follows:

1. Plaintiff's Renewed Motion for Preliminary Approval of Class Action Settlement (Doc. No. 24) is GRANTED;

2. The Class is conditionally certified for purposes of settlement only and is defined as follows:

> All non-exempt current and former employees who worked for Defendant NCI Group, Inc. as hourly warehouse workers, industrial workers, shipping checkers, distribution employees, shipping clerks, packers, stackers, loaders, packaging clerks, machine operators, receiving clerks, production workers, and all other similarly situated employees in California from June

---

form be modified accordingly.

6, 2014 through February 24, 2020;

3. The proposed settlement, as set forth in the Amended Stipulation re: Settlement of Class and Representative Action ("Amended Stipulation") (Doc. No. 24-2), is preliminarily approved;

4. The Class Notice and notice plan set forth in the Amended Stipulation are approved, subject to the caveat that the Class Notice shall be modified to remove the reference to a Preliminary Approval Hearing (see Doc. No. 24-2 at 45) and accurately reflect the relevant procedural history in this case;

5. The parties shall implement the notice plan set forth in the Amended Stipulation and prepare for the Final Approval Hearing according to the timeline set forth in the Amended Stipulation;

6. As set forth in the Amended Stipulation, each Class Member will have 45 days after the date on which the Settlement Administrator mails the Class Notice to object to or opt out of the proposed settlement by following the procedures set forth in the Class Notice;

7. The Court authorizes the retention of Rust Consulting, Inc. as Settlement Administrator, pursuant to the terms of the Amended Stipulation;

8. David Mara and Jill Vecchi of Mara Law Firm, PC are conditionally designated Class Counsel;

9. Arturo Gonzalez is conditionally designated Class Representative;

10. The parties shall appear on January 23, 2023, 1:30 p.m. in Courtroom 2 of the United States District Court, Eastern District, Fresno Division, before the undersigned for the Final Approval Hearing, which may include consideration of the following:

    a. Timely written objections to the proposed settlement by Class Members;

    b. Oral statements by Class Members in support of or in opposition to settlement;

    c. Responses by Class Counsel and counsel for Defendant to any objections to settlement timely submitted or properly raised at the hearing by Class

        Members;

        d. Other information provided by the parties bearing on approval of the settlement or settlement administration costs;

        a. Requests by Class Counsel for attorneys' fees and litigation expenses, as well as any application for a class representative enhancement payment;

11. Pending further order of the Court, all proceedings in this matter except those contemplated herein and in the Amended Stipulation are stayed.

IT IS SO ORDERED.

Dated:   August 8, 2022

SENIOR DISTRICT JUDGE