David Mara, Esq. (230498)
Jill Vecchi, Esq. (299333)
**MARA LAW FIRM, PC**
2650 Camino Del Rio North, Suite 302
San Diego, California 92108
Telephone: (619) 234-2833
Facsimile: (619) 234-4048

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

ARTURO GONZALEZ on behalf of himself, all others similarly situated, and on behalf of the general public,

               Plaintiffs,

v.

NCI GROUP, INC., dba NCI BUILDING SYSTEMS; and DOES 1-100,

               Defendants.

Case No. 1:18-cv-00948-AWI-SKO

*Assigned to the Hon. Anthony W. Ishii*

**PLAINTIFF ARTURO GONZALEZ'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

| | |
|---|---|
| **Date:** | **January 23, 2023** |
| **Time:** | **1:30 p.m.** |
| **Judge:** | **Hon. Anthony W. Ishii** |
| **Courtroom:** | **2** |

Action Filed: June 6, 2018
Action Removed: July 12, 2018
Trial Date: None Set

**TO ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff Arturo Gonzalez moves this Court for an order: (1) confirming certification of the Class for settlement purposes only; (2) finally approving the settlement embodied in the Amended Stipulation Regarding Settlement of Class and Representative Action; (3) confirming Rust Consulting, Inc. as the Settlement Administrator and granting the requested fee for its services as Settlement Administrator; (4) finally approving the Private Attorneys General Act of 2004 Payment; and (5) entering judgment.

This motion is set for determination on January 23, 2023, at 1:30 p.m. in Courtroom 2 before the Honorable Anthony W. Ishii in Robert E. Coyle United States Courthouse located at 2500 Tulare Street, Eight Floor, Fresno, California 93721. This motion is based upon this notice, the accompanying Memorandum of Points & Authorities filed herewith, the accompanying Declaration of David Mara filed herewith and all exhibits thereto, the Declaration of Lisa Pavlik for Rust Consulting, Inc., the Order Granting Preliminary Approval, the filings on record in this case, and upon such further evidence, both documentary and oral, that may be presented at the hearing of this motion.

Dated: December 14, 2022

**MARA LAW FIRM, PC**

By:/s/ *Jill Vecchi*
    David Mara, Esq.
    Jill Vecchi, Esq.
    Attorneys for Plaintiff

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...........................................1

   a.  Investigation ....................................................................................................1

   b.  Settlement Negotiations...................................................................................2

III.   SUMMARY OF SETTLEMENT......................................................................2

   a.  The Proposed Class and Subclasses ................................................................2

   b.  The Gross Settlement Amount .........................................................................3

   c.  Settlement Payments to Class Members...........................................................3

   d.  Funding and Distribution of Settlement Funds ................................................6

   e.  Uncashed Checks and Cy Pres Payment .........................................................6

   f.  Released Claims ..............................................................................................7

IV.   THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL...................8

   a.  Dissemination of the Class Notice ..................................................................8

   b.  No Objections or and Only One Request for Exclusion Were Received by Rust..........................9

II.   DISCUSSION....................................................................................................9

   a.  The Settlement Meets the Standards Governing Final Approval .......................9

      i.  The Settlement was a Result of Arm's-Length Negotiations .................10

      ii.  *In re Bluetooth* Factors are not Present Here......................................10

      iii.  The Settlement is Fair..........................................................................11

      iv.  Liability on the Merits and Class Certification .....................................12

         1.  Rest and Meal Break Claims ...........................................................12

         2.  Unpaid Wages Resulting From NCI's Control During Meal Periods ...............15

         3.  Waiting Time Claims .......................................................................15

         4.  Wage Statement Claims ...................................................................16

         5.  PAGA ..............................................................................................17

   b.  Sufficient Discovery and Investigation Has Occurred .....................................18

c.     Class Counsel Have Extensive Experience Acting as Class Counsel ............................ 19

d.     The Class Members' Response to the Settlement is Further Evidence That the Settlement is Fair and Reasonable ........................................................................................................ 19

e.     The Court Should Approve the Settlement Administration Fee .................................... 19

f.     The Court Should Approve the PAGA Payment to the LWDA ..................................... 20

V.     CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

**CASES**

*Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157 (2008)........................................................16, 17

*Augustus v. ABM Security Services, Inc.*, 2 Cal. 5th 257 (2016)........................................................12

*Avila v. Cold Spring Granite Co.*, 2018 U.S. Dist. LEXIS 6142 (E.D. Cal. Jan. 12, 2018) ....................17

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ........................................................10

*Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir. 1992)........................................................9

*Cortez v. Best Buy Stores*, 2012 WL 255345 (C.D. Cal. Jan. 25, 2012) ........................................................15

*Elder v. Schwan Food Co.*, 2011 WL 1797254 (Cal. Ct. App. May 12, 2011) ........................................17

*Fleming v. Covidien Inc.*, 2011 WL 7563047 (C.D. Cal. Aug. 12, 2011)........................................................17

*Ghory v. Al-Lahham*, 209 Cal.App.3d 1487 (1989) ........................................................15

*Green v. Lawrence Serv. Co.*, 2013 WL 3907506 (C.D. Cal. July 23, 2013) ..........................................14

*Guinn v. Sugar Transport of the Northwest, Inc.*, 2017 WL 6513306 (E.D. Cal. 2017) ........................15

*H&R Block Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................................................10

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................................................9, 10, 11

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) ....................10, 11

*In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005)....................9

*In re Taco Bell Wage & Hour Actions*, 2016 U.S. Dist. LEXIS 48577 (E.D. Cal. 2016)........................14

*Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000) ........................................................9

*Kaanaana v. Barret Business Services, Inc*, 29 Cal.App.5th 778 (2018)........................................................13

*Kirkorian v. Borelli*, 695 F. Supp. 446 (N.D. Cal. 1988) ........................................................10

*Lanzarone v. Guardsmark Holdings, Inc.*, 2006 WL 4393465 (C.D. Cal. 2006) ..................................15

*Li v. A Perfect Day Franchise, Inc.* 2012 WL 2236752 (N.D. Cal. June 15, 2012) ..............................17

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998)........................................................11

*Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832 (9th Cir. 1976) ....................................19

*Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977) ........................................................11

*Nguyen v. Baxter Healthcare Corp.*, 2011 WL 6018284 (C.D. Cal. Nov. 28, 2011) ..............................14

*Officers for Justice v. Civil Service Comm. of City and County of San Francisco*, 688 F. 2d 615 (9th Cir. 1982) ................................................................................................................................11

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) .........................................................10

*Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611 (S.D. Cal. 2014) .......................................................15

*Studley v. Alliance Healthcare Servs., Inc.*, 2012 WL 12286522 (C.D. Cal. July 26, 2012)...................14

*Thurman v. Bayshore Transit Mgmt., Inc.* 203 Cal.App.4th 1112 (2012) .................................................17

*Van Ba Ma v. Covidien Holding, Inc.*, 2014 U.S. Dist. LEXIS 76359 (C.D. Cal. 2014).........................11

## I. INTRODUCTION

Plaintiff Arturo Gonzalez ("Plaintiff") seeks final approval of the Parties' Amended Stipulation Regarding Settlement of Class and Representative Action ("Amended Stipulation").[1] The proposed Settlement is a non-reversionary $600,000 Maximum Settlement Amount ("MSA") on behalf of 317 Class Members. The proposed Class is defined as "all non-exempt current and former employees who worked for Defendant NCI Group, Inc. as hourly warehouse workers, industrial workers, shipping checkers, distribution employees, shipping clerks, packers, stackers, loaders, packaging clerks, machine operators, receiving clerks, production workers, and all other similarly situated employees in California at any time during the Class Period." The Class Period extends from June 6, 2014, through February 24, 2020. The settlement is projected to pay each Settlement Class Member an average settlement share of approximately $1,187.07.[2] The highest estimated settlement share is approximately $4,835.07.[3]

In response to the Class Notice, no Class Members objected to the settlement and only one Class Member requested to be excluded from the settlement. Therefore, 316 Class Members are participating in the settlement. The Class Members' response supports the Court's finding that the settlement is fair, reasonable, and adequate. For the reasons that follow, it is respectfully requested the Court grant this motion and find the settlement is fair, reasonable, and adequate.

## II. FACTUAL AND PROCEDURAL BACKGROUND

NCI manufactures and markets metal building systems and components for the nonresidential construction industry. To carry out its business, NCI employs warehouse workers. This lawsuit alleges that NCI violated various California wage and hour laws applicable to NCI's warehouse workers. Plaintiff filed this matter in Merced County Superior Court on June 6, 2018. NCI filed an Answer on July 12, 2018 and removed this matter on July 12, 2018. Mara Decl. ¶¶ 2-3.

### a. Investigation

Plaintiff propounded special interrogatories and demands for production of documents to which

---

[1] A true and correct copy of the Amended Stipulation is attached to the Declaration of David Mara, Esq. as **Exhibit 1**.
[2] Declaration of Lisa Pavlik for Rust Consulting, Inc. ("Pavlik Decl.") ¶ 16.
[3] Pavlik Decl. ¶ 16.

NCI responded. NCI produced hundreds of documents including employee handbooks and policy manuals, earning statements, personnel files, break logs, job descriptions and work tasks. NCI also produced tens of thousands of lines of time records—the majority of which were produced in a raw electronic format which had to be analyzed and interpreted. NCI also propounded written discovery to which Plaintiff responded. Mara Decl. ¶ 4.

### b. Settlement Negotiations

The Parties attended a mediation on November 19, 2019 and engaged in extensive arm's-length negotiations mediated by retired Superior Court Judge and well-respected mediator, Honorable Joan M. Lewis (Ret). As a result of meditation, the Parties signed a Term Sheet Settlement Agreement and negotiated and finalized a Stipulation Regarding Settlement of Class and Representative Action. On February 3, 2020, Plaintiff filed a motion for preliminary approval. (ECF Dkt. No. 18). The Court issued an Order on Plaintiff's Motion for Preliminary Approval of Class Action Settlement (ECF Dkt. No. 21) on August 6, 2020. Thereafter, the Parties revised the terms of the settlement and entered into an Amended Stipulation Regarding Settlement of Class and Representative Action, which is now before the Court for final approval. Mara Decl. ¶ 5.

## III. SUMMARY OF SETTLEMENT

### a. The Proposed Class and Subclasses

The Class is comprised of: All non-exempt current and former employees who worked for Defendant NCI Group, Inc. as hourly warehouse workers, industrial workers, shipping checkers, distribution employees, shipping clerks, packers, stackers, loaders, packaging clerks, machine operators, receiving clerks, production workers, and all other similarly situated employees in California at any time during the time period of June 6, 2014, through February 24, 2020.

The Class is comprised of three (3) subclasses:

Meal, Rest, and Unpaid Wages Subclass: This subclass includes all Class Members.

Waiting Time Penalties Subclass: This subclass includes all Class Members who worked for Defendant at any time from June 6, 2015 through February 24, 2020, and who are no longer employed by Defendant.

**Wage Statement and PAGA Subclass**: This subclass includes all Class Members who worked for Defendant during the period of time from June 6, 2017 through February 24, 2020.

*See* Mara Decl., **Ex. 1** at Section VI, ¶¶ 1.4.

**b. The Gross Settlement Amount**

NCI shall pay an MSA of $600,000 to fully and finally settle this matter. This is the total amount NCI can be required to pay under this Settlement, with the exception of employer payroll taxes, which will remain NCI's exclusive responsibility and will be paid by NCI separate and apart from the MSA. ***No portion of the MSA will revert to NCI for any reason***. Subject to the Court's final approval, the following deductions will be made from the GSA: (1) $5,000 to Plaintiff/Class Representative Arturo Gonzalez, to compensate him for his time, effort and risks he undertook in filing this lawsuit; (2) $150,000 (25% of the MSA) to Class Counsel for attorneys' fees to compensate them for their work on the lawsuit, as well as any work remaining in securing Court approval of the settlement, administration of the settlement, and obtaining dismissal of the lawsuit; (3) $9,887.94 (previously estimated not to exceed $30,000) to Class Counsel for reimbursement of their litigation costs; (4) $15,000 to Rust Consulting, Inc. ("Rust") for its work performed and to be performed in administering the settlement; and (5) $45,000 to the California Labor and Workforce Development Agency ("LWDA") for its 75% share of the $60,000 PAGA Payment.

**c. Settlement Payments to Class Members**

After all deductions have been made, it is estimated that $375,112.06 ("Net Settlement Amount" or "NSA") will be available for disbursement to Settlement Class Members. The money available for payout to these individuals comes out of the NSA, which is what remains of the MSA after subtracting all Court approved attorneys' fees and costs, the class representative enhancement, settlement administration costs, and the PAGA Payment.

The NSA is comprised of three (3) payout funds:

**Meal, Rest, and Unpaid Wages Payout Fund**: This fund shall comprise eight-three percent (83%) of the NSA.

**Waiting Time Penalties Payout Fund**: This fund shall comprise seven percent (7%) of the NSA.

<u>Wage Statement and PAGA Payout Fund</u>: This fund shall comprise ten percent (10%) of the NSA.

*See* Mara Decl., **Ex. 1** at Section VI, ¶¶ 1.27. Each Settlement Class Member's Settlement Payment will be the product of three (3) calculations. These calculations are tied to the unique circumstances of each Class Member.

First, Settlement Class Members will receive a payment as part of the Meal, Rest, and Unpaid Wages Subclass. This payment will be calculated by multiplying the Meal, Rest, and Unpaid Wages Shift Value[4] by that Settlement Class Member's number of "Meal, Rest, and Unpaid Wages Individual Adjusted Shifts." A Settlement Class Member's number of "Meal, Rest, and Unpaid Wages Individual Adjusted Shifts" is the Subclass Member's number of actual shifts worked for Defendant during the Class Period multiplied by the Subclass Member's Adjusted Shift Multiplier. The "Adjusted Shift Multiplier" accounts for and is tied to the Subclass Member's last known rate of pay. The "Adjusted Shift Multiplier" is the Settlement Class Member's Last Known Pay Rate multiplied by 0.1. For example, if a Settlement Class Member's Last Known Pay Rate is $17.50, the Adjusted Shift Multiplier would be 1.75. Therefore, a Settlement Class Member who earned $20.00 per hour will be credited with twice as many shifts – and therefore damages – as a Settlement Class Member who earned $10.00 per hour.

Second, Settlement Class Members may also be entitled to a payment from the Waiting Time Penalties Payout Fund if they are a member of the Waiting Time Penalties Subclass. These payments will be calculated by multiplying the Waiting Time Penalties Shift Value[5] by that Settlement Class Member's number of Waiting Time Penalties Individual Adjusted Shifts, if any such shifts were worked. Each Settlement Class Member's number of Waiting Time Penalties Individual Adjusted Shifts will be the product of (1) the number of actual shifts worked for Defendant by the Waiting Time Penalties Subclass Member during the period of time from June 6, 2015 through February 24, 2020 up to a maximum of 30 shifts,[6] and (2) the Waiting Time Penalties Subclass Member's Adjusted Shift Multiplier. As noted above,

---

[4] "Meal, Rest, and Unpaid Wages Shift Value" is the number which is the quotient of the Meal, Rest, and Unpaid Wages Payout Fund divided by the Total Adjusted Meal, Rest, and Unpaid Wages Shifts.

[5] "Waiting Time Penalties Shift Value" is the number which is the quotient of the Waiting Time Penalties Payout Fund divided by the Total Adjusted Waiting Time Penalties Shifts.

[6] Under California Labor Code Section 203, "If an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the

the "Adjusted Shift Multiplier" accounts for and is tied to the Subclass Member's last known rate of pay. The "Adjusted Shift Multiplier" is the Settlement Class Member's Last Known Pay Rate multiplied by 0.1.

Last, Settlement Class Members may also be entitled to a payment from the Wage Statement Payout Fund and the PAGA Payout Fund if they are a member of the Wage Statement and PAGA Subclass. These payments will be calculated by multiplying the Pay Period Value[7] by that Settlement Class Member's number of Qualifying Pay Periods, if any such pay periods were worked. Qualifying Pay Periods are any pay period in which a Wage Statement and PAGA Subclass Member worked for Defendant from June 6, 2017 through February 24, 2020. Both Plaintiff's wage statement claims and PAGA claims have a one-year statute of limitations and incur penalties based upon pay periods worked. In addition, because penalties under Plaintiff's wage statement claims and PAGA claims are statutorily prescribed and do not take into account an employee's hourly rate, each employee who worked a Qualifying Pay Period would be entitled to the same damages regardless of what they earned per hour. Stated differently, Plaintiff's wage statement claims and PAGA claims do not differentiate damages owed based upon the hourly rate an employee earned.

Each Settlement Class Member's portion of the Meal, Rest, and Unpaid Wages Payout Fund will be apportioned as 90% wages and 10% interest. Each Settlement Class Member's portion of the Waiting Time Penalties Payout Fund and Wage Statement and PAGA Payout Fund will be apportioned as 100% penalties and interest. The amounts paid as wages shall be subject to all tax withholdings customarily made from an employee's wages and all other authorized and required withholdings customarily made from an employee's wages and shall be reported on IRS Form W-2. The amounts paid as penalties and interest shall be reported on IRS Form 1099. *See* Mara Decl., **Ex. 1** at Section VI, ¶¶ 2.1.1.

/ / /

---

due date thereof at the same rate until paid or until an action therefor is commenced; ***but the wages shall not continue for more than 30 days.***" (Emphasis added). Therefore, an employee cannot receive waiting time penalties in excess of 30 days.

[7] "Pay Period Value" is the number which is the quotient of the Wage Statement Payout Fund and PAGA Payout Fund divided by the Total Pay Periods.

### d. Funding and Distribution of Settlement Funds

Upon final approval, NCI will fund the MSA within five (5) business days after the Effective Date.[8] Within fifteen (15) business days after the Effective Date, the Administrator will disburse all payments required under the Settlement. *See* Mara Decl., **Ex. 1** at Section VI, ¶¶ 2.8.1, 2.8.2.

### e. Uncashed Checks and Cy Pres Payment

Any checks issued to Settlement Class Members shall remain valid and negotiable for 180 days from the date of mailing. If any checks are not redeemed or deposited within ninety (90) calendar days after mailing, the Settlement Administrator will send a reminder postcard indicating that unless the check is redeemed or deposited before the expiration date, it will expire and become non-negotiable, and offer to replace the check if it was lost or misplaced. The Parties agreed that a *cy pres* beneficiary will receive the funds that were allocated to Settlement Class Members who did not cash or deposit their checks. *See* Mara Decl., **Ex. 1** at Section VI, ¶¶ 2.8.4-2.8.5.

The Parties chose Legal Aid at Work ("Legal Aid") as the *cy pres* beneficiary because it offers legal services and various trainings to employees on their rights. For instance, Legal Aid offers a Workers' Rights Clinic to low-income and unemployed people to provide information about legal rights related to the workplace. Other Legal Aid clinics help workers file claims for unpaid wages. For example, the Wage Claim Clinic empowers workers by offering free advice and assistance in filing wage claims with the California Labor Commissioner. Legal Aid maintains free do-it-yourself guides, toolkits, and letters for handling communications with employers as well as a variety of free trainings for employees to learn about their workplace rights. Legal Aid even brings class actions and individual actions on behalf of workers.

///

///

---

[8] The Effective Date means the date on which the Judgment becomes final and can no longer be appealed or otherwise disturbed because one of the following has occurred: (i) the final affirmance on appeal of the Judgment; (ii) the final dismissal with prejudice of any appeal from the Judgment; or (iii) if there are no objectors and no plaintiffs in intervention at the time the court grants final approval of the settlement and enters the Judgment, the date the Court grants final approval and enters Judgment.. *See* Mara Decl., **Ex. 1**, at Section VI, ¶ 1.13.

**f. Released Claims**

In exchange for NCI's promise to make the payments provided for in the Settlement, as of the Effective Date, Settlement Class Members will release the following Released Claims – all of which are limited to the allegations arising from the facts alleged in the operative complaint:

"Released Claims" shall collectively mean all claims, including without limitations "Unknown Claims" as defined in Paragraph 1.48 hereof, demands, rights, liabilities and causes of action of every nature and description whatsoever including without limitation statutory, constitutional, contractual or common law claims, whether known or unknown, against the Defendant Releasees, or any of them, for any type of relief arising out of any Settlement Class Member's employment with Defendant, based on the facts alleged in the Complaint, that accrued during the Class Period for alleged or actual (i) failure to compensate for all hours worked; (ii) failure to pay regular and/or premium wages at the proper hourly rates for all hours worked; (iii) failure to comply with payroll or wage record-keeping documentation or wage statement itemization requirements; (iv) failure to provide sufficient meal and/or rest periods or pay additional sums of money in lieu thereof; (v) failure to timely pay wages due at termination or otherwise; (vi) failure to furnish accurate wage statements; (vii) failure to pay minimum wages; (viii) unfair business practices relating to or arising out of the previous claims; and (ix) to the extent not covered above, any claims pled in or reasonably arising out of the facts alleged in the Complaint. Released Claims include (1) claims for penalties or any other remedies under any statute or regulation or other provision of law, based on the facts alleged in the Complaint, including without limitation claims under California Labor Code sections 201-204, 216, 225.5, 226, 226.3, 226.7, 500, 510, 512, 558, 1174, 1174.5, 1197, 1198, California Labor Code section 1194, *et seq.*, California Labor Code section 2698 *et seq.*, California Business and Professions Code section 17200 *et seq.*, any applicable California Industrial Welfare Commission Wage Order; (2) claims, based on the facts alleged in the Complaint, for injunctive relief, restitution, disgorgement, accounting, declaratory relief or other equitable relief; (3) any and all claims, based on the facts alleged in the Complaint, for interest, costs, or attorney fees, including without limitation claims under California Labor Code sections 218.5, 1194 & 2698 *et seq*. and California Code of Civil Procedure section 1021.5; (4) and, to the extent not covered above, any and all claims arising from the facts alleged in the Complaint in the Litigation.

"Unknown Claims" means any Released Claims which the Class Representative or any Settlement Class Member does not know or suspect to exist in his or her favor at the time of the entry of the Judgment, and which, if known by him or her might have affected his or her settlement with and release of the Defendant Releasees or might have affected his or her decision not to object to this settlement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, the Class Representative shall expressly and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, waived the provisions, rights and benefits of California Civil Code section 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

The Class Representative and each Settlement Class Member may hereafter discover facts in addition to or different from those which he or she now knows or believes to be true with respect to the subject matter of the Released Claims, but the Class Representative and each Settlement Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which then exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Class Representative acknowledges, and the Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

For the sake of clarity, the Settling Parties agree that Unknown Claims include only those claims that meet the definition of Released Claims and do not include claims that do not meet the definition of Released Claims. As such, for example, Unknown Claims do not include claims for any relief for wrongful termination, unlawful harassment, Workers' Compensation, or other claims that do not arise from the facts alleged in the Complaint.

The release covers claims that were alleged or could have been alleged in Plaintiff's complaint and the release is tied to the facts and allegations contained therein. *See* Mara Decl., **Ex. 1**, at Section IV, ¶ ¶ 1.36, 1.48.

## IV. THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL

### a. Dissemination of the Class Notice

The Court granted preliminary approval of the settlement on August 8, 2022. (ECF Dkt. No. 28). At that time, Rust was appointed by the Court as the Settlement Administrator. Rust has complied with this Court's orders concerning dissemination of the Class Notice. After the Court granted preliminary approval, on August 17, 2022, NCI sent the Class List to Rust. (Pavlik Decl. ¶ 8). Rust conducted a National Change of Address search on the addresses in the Class List in an attempt to update the addresses as accurately as possible. (*Id.* at ¶ 9). The Class Notice was mailed to Class Members on September 7, 2022. (*Id.* at ¶ 10).

As of the date of this filing, forty (40) Class Notices were returned by the U.S. Postal Service as undeliverable. (Pavlik Decl. ¶ 11). As a result of Rust's skip trace efforts on all returned mail, 39 Class Notices were re-mailed. (*Id.*). Ultimately, eight (8) Class Notices are currently deemed undeliverable. (*Id.*). These Class Notice represent 2% of the Class Members.

### b. No Objections or and Only One Request for Exclusion Were Received by Rust

The deadline to submit an objection to the settlement or a request for exclusion from the settlement was October 24, 2022. No objections have been filed with the Court or submitted to Rust. (Pavlik Decl. at ¶ 15). One request for exclusion was received by Rust. (*Id.* at ¶ 14). Therefore, 99% of the 317 Class Members are participating in the settlement.

## II. DISCUSSION

### a. The Settlement Meets the Standards Governing Final Approval

Matters that have been filed as class actions require court approval before a settlement can be consummated. *See* Fed. R. Civ. Proc. ("FRCP") 23(e). FRCP 23(e) provides that any compromise of a class action must receive Court approval. The Court has broad discretion to grant approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In determining whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555, *9 (C.D. Cal. June 10, 2005) (*citing Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Approval of a class action settlement involves a two-step process. In determining whether to grant final approval of the settlement, a court examines the terms for overall fairness and, in so doing, balances the following factors: the strength of the plaintiff's case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed; the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and, the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026.

Here, the proposed settlement was reached only after undertaking a robust factual and legal investigation into the claims and defenses in this lawsuit. The settlement amount takes into consideration the risks with regard to the Court granting certification of Plaintiff's claims, as well as difficulties associated with prevailing on the merits. In light of these risks, the settlement amount is well within the ballpark of reasonableness.

### i. The Settlement was a Result of Arm's-Length Negotiations

The Ninth Circuit has shown longstanding support of settlements reached through arm's length negotiation by capable opponents. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009), the Ninth Circuit expressly opined that courts should defer to the "private consensual decision of the [settling] parties." *Id.* at 965, citing *Hanlon*, 150 F.3d at 1027. "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *H&R Block Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) (opinion of experienced counsel is entitled to considerable weight); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (recommendations of plaintiffs' counsel should be given a presumption of reasonableness). The proposed settlement is the product of arm's-length negotiations facilitated by Honorable Joan A. Lewis (Ret).

### ii. *In re Bluetooth* Factors are not Present Here

In *Bluetooth,* the Ninth Circuit articulated additional factors that need to be considered, especially where a settlement has been reached prior to formal class certification. *In re Bluetooth Headset Products Liability Litigation* ("*Bluetooth*"), 654 F.3d 935, 946 (9th Cir. 2011). As such, settlement agreements reached prior to class certification must withstand a higher level of scrutiny for signs of collusion or other conflicts of interest than ordinarily are required under Rule 23(e). The three signs *Bluetooth* instructs trial courts to look for are:

1. When class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply rewarded;
2. When the parties negotiate a 'clear sailing' arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by defendant;

3. When the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id* at 947. This settlement passes the *Bluetooth* test. The NSA is over two and a half times larger than the fees requested by Class Counsel, which is the accepted federal benchmark of 25% of the GSA. Additionally, any amount requested by Class Counsel and not awarded by the Court shall become part of the NSA and distributable to Participating Class Members. Accordingly, unlike the settlement agreement in *Bluetooth,* the instant settlement cannot be said to arouse suspicion of collusion.

### iii. The Settlement is Fair

When evaluating the settlement terms for purposes of ruling on whether to finally approve it, the Court is to review the strength of a plaintiff's case, including "the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members." *Van Ba Ma v. Covidien Holding, Inc.*, 2014 U.S. Dist. LEXIS 76359, *6-7 (C.D. Cal. 2014) (*citing Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977)). In ruling on final approval, the "fairness hearing is not to be turned into a trial or a rehearsal for trial on the merits." *Id.* (*quoting Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

There is no standard or benchmark for determining whether a settlement is fair. "Ultimately the district court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Officers for Justice v. Civil Service Comm. of City and County of San Francisco*, 688 F. 2d 615, 625 (9th Cir. 1982). A court should weigh the benefits that the settlement will realize for the class against the uncertainty of litigation and the possibility that the class members would obtain no relief in the absence of a settlement. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("...it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."); *see also Hanlon*, 150 F.3d at 1026 (When considering the fairness of a proposed class settlement, courts consider the strength of a plaintiff's case against the risk, expense, complexity and likely duration of further litigation.).

/ / /

/ / /

### iv. Liability on the Merits and Class Certification

Plaintiff recognizes that none of his class-wide claims would result in a guaranteed win. Plaintiff's core claims here are for meal and rest break violations and unpaid wages, which faced significant challenges that had to be considered in negotiating a class-wide settlement.

### 1. Rest and Meal Break Claims

With regard to rest periods, under California law, employers must authorize "ten (10) minutes net rest time per four (4) hours or major fraction thereof." Wage Order 1, Section 12(A). A DLSE letter, which the California Supreme Court cited with approval in *Augustus v. ABM Security Services, Inc.*, stated "there must be a net 10 minutes of rest provided in each 'work period' and the rest period must be, as the language implies, duty-free." 2002 Cal. DLSE LEXIS 30 (Cal. Div. of Labor Standards Enforcement Feb. 22, 2002); *see also Augustus v. ABM Security Services, Inc.*, 2 Cal. 5th 257, 267 (2016). Thus, the DLSE has defined a "net" ten minutes to mean that the rest period begins when the employee reaches an area away from the work area that is appropriate for rest. *Id*. Employers must authorize and permit "a net 10 minutes of rest . . . in each 'work period' and the rest period must be, as the language implies, duty-free." *Augustus*, 2 Cal. 5th at 257. "That is, during rest periods employers must relieve employees of all duties and relinquish control over how employees spend their time." *Id*. at 269.

Turning to meal periods, under Labor Code section 226.7(a), "[n]o employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission." To satisfy its obligation to provide a meal period, employers must actually relieve employees of all duty and relinquish control over employee activities. *Brinker,* 53 Cal.4th at 1039-1040. In *Brinker,* the California Supreme Court ruled that the Wage Orders and California Labor Code section 512 require employers "to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work." *Brinker*, 53 Cal.4th at 1049. Also, during meal periods, "[t]he employer that refuses to relinquish control over employees during an owed meal period violates the duty to provide the meal period and owes compensation and premium pay for hours worked." *Id.* at FN 19.

Plaintiff contends NCI requires Class Members to wear protective gear during their shifts. Plaintiff

contends NCI requires employees to use part of their break time to don and doff their personal protective gear and to be back at their workstations within the time provided for the break (30 minutes for meal periods, and 15 minutes for rest breaks). Further, each of NCI's employee handbooks state, "employees are expected to be punctual in starting and ending their breaks and may be disciplined for tardiness in returning to work upon the conclusion of their breaks." Based on these policies, Plaintiff contends that NCI's meal and rest period policies are unlawful because they fail to provide employees with a full 30 minutes of duty-free time for meal breaks and a full net 10 minutes of rest during a rest period, given that employees must use part of their break time to don and doff protective gear and travel to and from the break area.

Plaintiff argues that NCI does not tell employees that they are entitled to a net 10 minutes of rest break time in a suitable rest area, regardless of whatever complications may arise in getting to or from the rest area. Rather, Plaintiff asserts NCI simply tells employees that they receive 15 minutes for rest periods and will be disciplined for tardiness. As such, Plaintiff claims that NCI fails to clearly communicate that employees' 15-minute rest breaks include at least 10 minutes of rest time that begins and ends in the rest area, regardless of how long it takes to get to and from the rest area. Likewise, Plaintiff further claims, because employees must perform duties—*e.g.*, donning/doffing protective gear and walking to/from a break room to their workstations during their allotted break time—their entire meal and rest period time is not theirs to do whatever they would like and is not "duty-free." Plaintiff maintains that the walk time to/from workstations and the don/doff intrusions result in denial of the Labor Code and Wage Order's scrupulous protection of employee rights to full 30-minute meal periods and 10-minute rest breaks. *See, e.g., Kaanaana v. Barret Business Services, Inc*, 29 Cal.App.5th 778, 783 (2018) ("[p]laintiffs are entitled to the statutory remedy under Labor Code section 226.7 – an additional hour of pay at their regular rate" when an employee's meal period is shortened by 3-5 minutes).

Plaintiff recognizes that NCI has defenses to Plaintiff's meal and rest period claims. NCI is likely to assert that it need not mirror the language in the Wage Order to comply with California's requirements; rather, NCI will contend that its written meal and rest break policies provided all required breaks, and informed employees when they should take their breaks. *Green v. Lawrence Serv. Co.*, Case No. 12-CV–

06155-JAK, 2013 WL 3907506, at *8 (C.D. Cal. July 23, 2013) ("[T]he absence of a formal written policy does not constitute a violation of the meal and rest period laws."). In fact, NCI is likely to argue that California does not require employers to affirmatively inform employees about their break rights. *Studley v. Alliance Healthcare Servs., Inc.*, Case No. 10-CV–00067–CJC, 2012 WL 12286522, at *3 (C.D. Cal. July 26, 2012) ("[T]here is no affirmative duty to inform employees of their break rights."); *Nguyen v. Baxter Healthcare Corp.,* Case No.10–CV–01436–CJC, 2011 WL 6018284, at *6 (C.D. Cal. Nov. 28, 2011) ("Ms. Nguyen's claim that she was not provided with a second meal period is premised on her claim that her supervisor did not inform her that she was entitled to a second thirty-minute break.... But there is no affirmative duty to inform employees of their break rights... Rather, Ms. Nguyen must proffer evidence that she was prohibited or deterred from taking a second meal period.").

Plaintiff recognizes the risk that the Court could agree that NCI's policies were sufficient to provide necessary meal periods and rest breaks under California law. Under *Brinker*, if an employer provides all necessary meal periods and rest breaks, it need not ensure meal and rest periods are taken. A reasonable factfinder could conclude that NCI's written policies were sufficient to provide all necessary meal periods and rest breaks.

Plaintiff has also learned that NCI intends to argue that there is no common policy or practice of (1) requiring production employees to remain at their work stations until the beginning of a meal break or rest break, (2) to take their breaks in a designated breakroom, and (3) to be back at their work stations by the end of the 30th minute for meal breaks and the end of the 15th minute for rest breaks. NCI is likely to contend that it forbids employees from performing any off-the-clock work and instructs employees to stop working to doff any project-specific protective gear before their breaks begin and don any project-specific protective gear after they return from a break.

Furthermore, Plaintiff recognizes the risk that the putative class may not be certified, if the Court credits NCI's evidence and rejects Plaintiff's evidence. NCI is likely to argue that individualized questions as to the circumstances surrounding each individualized meal period and rest break will predominate over common questions related to NCI's meal and rest break policies. *See In re Taco Bell Wage & Hour Actions* (E.D. Cal. 2016) 2016 U.S. Dist. LEXIS 48577 *20; *Guinn v. Sugar Transport of the Northwest, Inc.* (E.D.

Cal. 2017) 2017 WL 6513306 *7 (commonality not met when an inquiry would have to be made as to why each individual did not take their breaks at scheduled times); *Stiller v. Costco Wholesale Corp.* (S.D. Cal. 2014) 298 F.R.D. 611, 626 (certification denied where the policy at issue did not automatically trigger liability); *Cortez v. Best Buy Stores* (C.D. Cal. Jan. 25, 2012) 2012 WL 255345 ("each employee would have to testify as to what she was told…by her specific manager [regarding when to take breaks]"; *Lanzarone v. Guardsmark Holdings, Inc.* (C.D. Cal. 2006) 2006 WL 4393465 *7 ("[i]f a claim is based substantially on oral rather than written communications, class action is inappropriate as a matter of law.").

### 2. Unpaid Wages Resulting From NCI's Control During Meal Periods

As stated above, Plaintiff argues that NCI's policies require Class Members to perform work at the beginning of their meal periods after clocking out to doff protective gear and to don protective gear at the end of their meal period before clocking in. If the factfinder agreed with Plaintiff, Class Members would be entitled to wages for the time spent donning/doffing protective gear while on unpaid meal periods.

Again, NCI insists that regardless of when or where employees take their breaks, NCI contends it forbids off-the-clock work and instructs employees to don/doff any project-specific protective gear before the break begins and after they have clocked back into work.

### 3. Waiting Time Claims

An employer is liable for waiting time penalties if the "employer willfully fails to pay… any [owed] wages of an employee who is discharged or quits." Cal. Lab. Code § 203. The term "willful" in § 203 "means that the employer intentionally failed or refused to perform an act which was required to be done." *Ghory v. Al-Lahham*, 209 Cal.App.3d 1487, 1492 (1989).

The wages Plaintiff claims are owed are the same unpaid wages that are the subject of the unpaid straight time and overtime claims. Thus, the only additional issue that would need to be resolved would be whether NCI's failure to pay all wages was "willful" within the meaning of the statute. If the factfinder agrees with Plaintiff's theories of liability, Section 203 penalties will be proven in the single-stroke post-certification determination of whether NCI willfully failed to these wages at termination

Plaintiff recognizes the risk that the Court may determine that the mere failure to make payments

at termination—the right to which is the subject of a good faith dispute—cannot, as a matter of law, establish a "willful" failure to timely pay all wages. Plaintiff is aware of NCI's argument that it had a good faith basis for believing that it was paying all wages appropriately and that there was a "good faith dispute" that no additional wages were owed at the time of termination. Cal. Lab. Code § 203 ("waiting time" penalties are not owed where there is such a "good faith dispute"); *see also* Cal. Code Regs. tit. 8, § 13520; *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1201-1204 (2008). NCI is expected to present evidence that it forbids off-the-clock work and instructs employees to doff any project-specific protective gear before the break begins and don any project-specific protective gear after they clock back in from the break.

### 4. Wage Statement Claims

Cal. Lab. Code § 226(a) provides an employer shall furnish an "an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee,…(5) net wages earned…." An employee is deemed to suffer injury for purposes of § 226(e)(2)(B) if the employer fails to provide accurate and complete information as required and "the employee cannot promptly and easily determine from the wage statement alone" the "amount of gross wages or net wages paid to the employee during the pay period or any of the other information required to be provided on the itemized wage statement." Cal. Lab. Code § 226(e)(2)(B)(i). An employee is further deemed to suffer an injury if the employee is unable to promptly and easily determine from the wage statement alone the deductions the employer made from gross wages. Cal. Lab. Code § 226(e)(2)(B)(ii).

Plaintiff's theory of liability for wage statement violations derives from his unpaid wages claim. In other words, if Plaintiff prevails on his theory of liability for unpaid wages, then Plaintiff contends Class Members are entitled to penalties under Cal. Lab. Code § 226(e) for failure to include gross wages earned, total hours worked by the employee, and net wages earned, pursuant to Cal. Lab. Code § 226(a)(1)-(2) and (5). The statute of limitations for Plaintiff's inaccurate wage statement cause of action is only one (1) year.

This claim is subject to the same potential defenses NCI is likely to raise in defense of the above substantive claims. Plaintiff considers these defenses in evaluating the overall strength of the wage

statement claim.

## 5. PAGA

PAGA allows the private enforcement of certain Cal. Lab. Code sections relating to wage and hour violations. PAGA Section 2699(f)(2) provides a penalty of $100 per employee per pay period for an initial violation and $200 for each subsequent violation. However, California courts have interpreted this language to require notice to the employer that an initial violation occurred before penalties for subsequent violations could be assessed. *See Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1210. NCI argues that Plaintiff would not be able to stack violations for each alleged *Labor Code* violation and would only be entitled to one penalty for all violations per pay period – assuming Plaintiff prevailed on the merits.

Additionally, Section 2699, subdivision (e)(2) provides that in an action where an employee is seeking civil penalties under PAGA, "a court may award a lesser amount than the maximum penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary, oppressive, or confiscatory." The likelihood of the Court reducing the PAGA penalties awarded to Plaintiff and the aggrieved employees – assuming liability is proven as to each of Plaintiff's claims – is higher in this case where these same individuals may also be receiving money for the same unlawful conduct under the class claims. *See Avila v. Cold Spring Granite Co.* (E.D. Cal. Jan. 12, 2018) Case No. 1:16-cv-001533-AWI-SKO, 2018 U.S. Dist. LEXIS 6142 *17 ("Because the PAGA penalties sought are at least partially duplicative of penalties granted by the underlying Labor Code violations, *see, e.g.*, Cal. Lab. Code §§ 203, 226, 558(a), 1194.2, and because a Court has discretion in whether and in what amount to award PAGA penalties, *see* Cal. Lab. Code § 2699(e)(2), Plaintiff recognizes that the potential PAGA penalties are highly uncertain.").[9]

---

[9] *See also Thurman v. Bayshore Transit Mgmt., Inc.* 203 Cal.App.4th 1112, 1135-36 (2012)(affirming 30% reduction under specified PAGA claim where the employer produced evidence that it took its obligations seriously); *Elder v. Schwan Food Co.,* 2011 WL 1797254, at *5-*7 (Cal. Ct. App. May 12, 2011)(reversing trial court decision denying any civil penalties where violations had been proven, remanding for the trial court to exercise discretion to reduce, but not wholly deny, civil penalties); *Li v. A Perfect Day Franchise, Inc.* 2012 WL 2236752, at *17 (N.D. Cal. June 15, 2012)(denying PAGA penalties for violation of California Labor Code § 226 as redundant with recovery on a class basis pursuant to California Labor Code § 226, directly); *Fleming v. Covidien Inc.,* 2011 WL 7563047, at *4 (C.D. Cal. Aug. 12, 2011)(reducing PAGA penalties from $2.8 million to $500,000); *Aguirre v. Genesis Logistics,* 2013 WL 10936035 at *2-*3 (C.D. Cal. Dec. 30, 2013)(reducing penalty for past PAGA violations from

As Plaintiff's PAGA claims are based on the same alleged unlawful conduct as his class claims, Plaintiff's PAGA claims are subject to the same risks on the merits as Plaintiff's class claims. Therefore, PAGA penalties can only be awarded if the factfinder agrees with Plaintiff's theories of liability.

Should the Court agree with any of NCI's defenses, there is a potential that the individual class members would take nothing on their claims, and any associated PAGA penalties would be extinguished, as penalties can only be awarded if the Court agrees with the underlying allegations. Even if NCI's liability is established, the Court is empowered to reduce any PAGA penalties. The likelihood of a penalty reduction is higher in this case than others, as the Court may determine that NCI believed in good faith that it did not intrude into employees' break time. In addition, denial of walking time and time donning and doffing gear may not be considered as egregious as other meal period and rest breaks violations where absolutely zero break time is afforded. Further, if Plaintiff is successful on the merits, PAGA penalties would be duplicative of the recovery from the underlying violations. Therefore, Plaintiff recognizes and reasonably believes the Court could significantly reduce any PAGA penalties if NCI was found liable for the underlying Labor Code violations.

### b. Sufficient Discovery and Investigation Has Occurred

Class Counsel conducted a thorough investigation into the facts of this lawsuit. Throughout the course of litigation, the Parties engaged in written discovery. The written discovery conducted led to the exchange of hundreds of pages of documents. These documents include, but are not limited to, employee handbooks and policy manuals, earning statements, personnel files, break logs, job descriptions and work tasks. NCI also produced tens of thousands of lines of time records—the majority of which were produced in a raw electronic format which had to be analyzed and interpreted.

After conducting an analysis of the materials NCI produced, Class Counsel drew on their extensive experience in similar cases to assess the strengths and weaknesses of Plaintiff's claims. This discovery allowed the Parties to assess the merits and value of Plaintiff's claims and defenses thereto, if a settlement was not reached. Based on their review and independent investigation into the facts and claims asserted in this matter, Class Counsel believe that this settlement is fair, reasonable, and adequate and is in the best

$1.8 million to $500,000 after rejecting numerous other PAGA claims).

interest of the class.

### c. Class Counsel Have Extensive Experience Acting as Class Counsel

Class Counsel's experience in complex class action matters is extensive. Indeed, Mr. Mara from the Mara Law Firm, PC was class counsel in *Hohnbaum et al. v. Brinker Restaurant Corp et al.,* which is the subject case in the landmark decision of *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004. Class Counsel have prosecuted numerous cases on behalf of employees for California Labor Code violations and thus are experienced and qualified to evaluate the class claims present in this case, and the defenses thereto, and to evaluate settlement versus trial on a fully informed basis. This experience instructed Class Counsel on the risks and uncertainties of further litigation and guided their determination to endorse the proposed settlement.

### d. The Class Members' Response to the Settlement is Further Evidence That the Settlement is Fair and Reasonable

The Ninth Circuit has held that the number of class members who object to a proposed settlement is a factor to be considered in determining a settlement's fairness. *Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832, 837 (9th Cir. 1976). Here, not a single Class Member has objected to the settlement and only one Class Member requested to be excluded from the settlement, resulting in a 99% participation rate in the settlement. The lack of objections and low number of requests for exclusion evidences the Class Members' endorsement of this non-reversionary settlement.

### e. The Court Should Approve the Settlement Administration Fee

The Parties agreed to hire Rust as the Settlement Administrator, a choice the Court approved in conjunction with granting preliminary approval. Rust was responsible for mailing the Class Notice to Class Members, obtaining better addresses for undeliverable Class Notices, responding to Class Member inquiries, providing weekly status reports to all counsel, receiving communications from the Class Members, and providing a declaration documenting its duties and responsibilities in administering the Class Notice. Following the grant of final approval, Rust will continue to calculate the payments to Settlement Class Members, send the individual settlement shares to Settlement Class Members, distribute other payments ordered by the Court, and perform such other duties as described in the Amended Stipulation. Rust's fee of $15,000 for services rendered and to be rendered is fair and reasonable and

should be granted.

**f.  The Court Should Approve the PAGA Payment to the LWDA**

The payment of $45,000 (75% of $60,000) to the LWDA for its share of the applicable penalties claimed under PAGA, is reasonable under the circumstances. The Parties negotiated a good faith amount to the LWDA. The sum to be paid to the LWDA was not the result of self-interest at the expense of other Class Members. The LWDA was provided notice of the settlement concurrently with the filing of the preliminary approval motion and the instant motion. Plaintiff did not receive a response or objection to the settlement from the LWDA. Thus, Plaintiff respectfully requests the Court finally approve the sum of $45,000 for payment to the LWDA.

**V.    CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that the Court find the settlement is fair, reasonable, and adequate and grant final approval of the settlement. Plaintiff further requests the Court approve the requested settlement administration fee and PAGA payment. Last, Plaintiff respectfully requests the Court enter final judgment in this matter.

Dated: December 14, 2022               **MARA LAW FIRM, PC**

By:/s/ *Jill Vecchi*
   David Mara, Esq.
   Jill Vecchi, Esq.
   Attorneys for Plaintiff